# RUSH PRUDENTIAL HMO, INC. *v.* MORAN ET AL.

No. 00–1021.   Argued January 16, 2002—Decided June 20, 2002

356

358

SOUTER, J., delivered the opinion of the Court, in which STEVENS, O'CONNOR, GINSBURG, and BREYER, JJ., joined. THOMAS, J., filed a dissenting opinion, in which REHNQUIST, C. J., and SCALIA and KENNEDY, JJ., joined, *post*, p. 388.

*John G. Roberts, Jr.*, argued the cause for petitioner. With him on the briefs were *Clifford D. Stromberg, Craig A. Hoover, Jonathan S. Franklin, Catherine E. Stetson, James T. Ferrini, Michael R. Grimm, Sr.*, and *Melinda S. Kollross.*

*Daniel P. Albers* argued the cause for respondents. With him on the brief for respondent Moran were *Mark E. Rust* and *Stanley C. Fickle. James E. Ryan*, Attorney General, *Joel D. Bertocchi*, Solicitor General, and *John Philip Schmidt* and *Mary Ellen Margaret Welsh*, Assistant Attorneys General, filed a brief for respondent State of Illinois.

*Deputy Solicitor General Kneedler* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Acting Solicitor General Clement, James A. Feldman, Howard M. Radzely, Allen H. Feldman, Nathaniel I. Spiller*, and *Elizabeth Hopkins.**

---

*\*Miguel A. Estrada* and *Andrew S. Tulumello* filed a brief for the American Association of Health Plans, Inc., et al. as *amici curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the State of Texas et al. by *John Cornyn*, Attorney General of Texas, *Howard G. Baldwin, Jr.*, First Assistant Attorney General, *Jeffrey S. Boyd*, Deputy Attorney General, *Julie Parsley*, Solicitor General, *Christopher Livingston*, Assistant Attorney General, and *David C. Mattax*, and by the Attorneys General for their respective jurisdictions as follows: *Janet Napolitano* of Arizona, *Bill Lockyer* of California, *Gregory D'Auria* of Connecticut, *M. Jane Brady* of Delaware, *Robert A. Butterworth* of Florida, *Earl I. Anzai* of Hawaii, *Steve Carter* of Indiana, *G. Steven Rowe* of Maine, *Thomas F. Reilly* of Massachusetts, *J. Joseph Curran, Jr.*, of Maryland, *Jennifer M. Granholm* of Michigan, *Mike Hatch* of Minnesota, *Mike Moore* of Mississippi, *Jeremiah W. (Jay) Nixon* of Missouri, *Mike McGrath* of Montana, *Frankie Sue Del Papa* of Nevada, *John J. Farmer, Jr.*, of New Jersey, *Patricia A. Madrid* of New Mexico, *Eliot Spitzer* of New York, *Roy Cooper* of North Carolina, *Betty D. Montgomery* of Ohio, *W. A. Drew Edmondson* of Oklahoma, *D. Michael Fisher* of Pennsylvania, *Charles M.*

JUSTICE SOUTER delivered the opinion of the Court.

Section 4–10 of Illinois's Health Maintenance Organization Act, 215 Ill. Comp. Stat., ch. 125, § 4–10 (2000), provides recipients of health coverage by such organizations with a right to independent medical review of certain denials of benefits. The issue in this case is whether the statute, as applied to health benefits provided by a health maintenance organization under contract with an employee welfare benefit plan, is preempted by the Employee Retirement Income Security Act of 1974 (ERISA), 88 Stat. 832, as amended, 29 U. S. C. § 1001 *et seq.* We hold it is not.

## I

Petitioner, Rush Prudential HMO, Inc., is a health maintenance organization (HMO) that contracts to provide medical services for employee welfare benefit plans covered by ERISA. Respondent Debra Moran is a beneficiary under one such plan, sponsored by her husband's employer. Rush's "Certificate of Group Coverage," issued to employees who participate in employer-sponsored plans, promises that Rush will provide them with "medically necessary" services. The terms of the certificate give Rush the "broadest possible discretion" to determine whether a medical service claimed by a

*Condon* of South Carolina, *Paul G. Summers* of Tennessee, *Mark L. Shurtleff* of Utah, *William H. Sorrell* of Vermont, *Randolph A. Beales* of Virginia, *Christine O. Gregoire* of Washington, *Darrell V. McGraw, Jr.,* of West Virginia, *Hoke MacMillan* of Wyoming, and *Anabelle Rodriguez* of Puerto Rico; for AARP et al. by *Mary Ellen Signorille, Michael R. Schuster, Paula Brantner, Ronald Dean,* and *Judith L. Lichtman;* for the American Medical Association et al. by *Jack R. Bierig, Richard G. Taranto, Jon N. Ekdahl, Leonard A. Nelson,* and *Saul J. Morse;* for the National Association of Insurance Commissioners by *Jennifer R. Cook, Mary Elizabeth Senkewicz,* and *Marc I. Machiz;* and for Texas Watch et al. by *George Parker Young.*

Briefs of *amici curiae* were filed for the California Consumer Health Care Council et al. by *Sharon J. Arkin;* and for United Policyholders by *Arnold R. Levinson.*

beneficiary is covered under the certificate. The certificate specifies that a service is covered as "medically necessary" if Rush finds:

> "(a) [The service] is furnished or authorized by a Participating Doctor for the diagnosis or the treatment of a Sickness or Injury or for the maintenance of a person's good health.
>
> "(b) The prevailing opinion within the appropriate specialty of the United States medical profession is that [the service] is safe and effective for its intended use, and that its omission would adversely affect the person's medical condition.
>
> "(c) It is furnished by a provider with appropriate training, experience, staff and facilities to furnish that particular service or supply." Record, Pl. Exh. A, p. 21.

As the certificate explains, Rush contracts with physicians "to arrange for or provide services and supplies for medical care and treatment" of covered persons. Each covered person selects a primary care physician from those under contract to Rush, while Rush will pay for medical services by an unaffiliated physician only if the services have been "authorized" both by the primary care physician and Rush's medical director. See *id.*, at 11, 16.

In 1996, when Moran began to have pain and numbness in her right shoulder, Dr. Arthur LaMarre, her primary care physician, unsuccessfully administered "conservative" treatments such as physiotherapy. In October 1997, Dr. LaMarre recommended that Rush approve surgery by an unaffiliated specialist, Dr. Julia Terzis, who had developed an unconventional treatment for Moran's condition. Although Dr. LaMarre said that Moran would be "best served" by that procedure, Rush denied the request and, after Moran's internal appeals, affirmed the denial on the ground that the procedure was not "medically necessary." 230 F. 3d 959, 963 (CA7

2000). Rush instead proposed that Moran undergo standard surgery, performed by a physician affiliated with Rush.

In January 1998, Moran made a written demand for an independent medical review of her claim, as guaranteed by §4–10 of Illinois's HMO Act, 215 Ill. Comp. Stat., ch. 125, §4–10 *et seq.* (2000), which provides:

> "Each Health Maintenance Organization shall provide a mechanism for the timely review by a physician holding the same class of license as the primary care physician, who is unaffiliated with the Health Maintenance Organization, jointly selected by the patient . . . , primary care physician and the Health Maintenance Organization in the event of a dispute between the primary care physician and the Health Maintenance Organization regarding the medical necessity of a covered service proposed by a primary care physician. In the event that the reviewing physician determines the covered service to be medically necessary, the Health Maintenance Organization shall provide the covered service."

The Act defines a "Health Maintenance Organization" as

> "any organization formed under the laws of this or another state to provide or arrange for one or more health care plans under a system which causes any part of the risk of health care delivery to be borne by the organization or its providers." Ch. 125, §1–2.[1]

---

[1] In the health care industry, the term "Health Maintenance Organization" has been defined as "[a] prepaid organized delivery system where the organization *and* the primary care physicians assume some financial risk for the care provided to its enrolled members. . . . In a *pure HMO*, members must obtain care from within the system if it is to be reimbursed." Weiner & de Lissovoy, Razing a Tower of Babel: A Taxonomy for Managed Care and Health Insurance Plans, 18 J. of Health Politics, Policy and Law 75, 96 (Spring 1993) (emphasis in original). The term "Managed Care Organization" is used more broadly to refer to any number of systems combining health care delivery with financing. *Id.*, at 97. The Illinois definition of HMO does not appear to be limited to the tradi-

When Rush failed to provide the independent review, Moran sued in an Illinois state court to compel compliance with the state Act. Rush removed the suit to Federal District Court, arguing that the cause of action was "completely preempted" under ERISA. 230 F. 3d, at 964.

While the suit was pending, Moran had surgery by Dr. Terzis at her own expense and submitted a $94,841.27 reimbursement claim to Rush. Rush treated the claim as a renewed request for benefits and began a new inquiry to determine coverage. The three doctors consulted by Rush said the surgery had been medically unnecessary.

Meanwhile, the federal court remanded the case back to state court on Moran's motion, concluding that because Moran's request for independent review under § 4–10 would not require interpretation of the terms of an ERISA plan, the claim was not "completely preempted" so as to permit removal under 28 U. S. C. § 1441.[2] 230 F. 3d, at 964. The state court enforced the state statute and ordered Rush to submit to review by an independent physician. The doctor selected was a reconstructive surgeon at Johns Hopkins Medical Center, Dr. A. Lee Dellon. Dr. Dellon decided that Dr. Terzis's treatment had been medically necessary, based on the definition of medical necessity in Rush's Certificate of

tional usage of that term, but instead is likely to encompass a variety of different structures (although Illinois does distinguish HMOs from pure insurers by regulating "traditional" health insurance in a different portion of its insurance laws, 215 Ill. Comp. Stat., ch. 5 (2000)). Except where otherwise indicated, we use the term "HMO" because that is the term used by the State and the parties; what we intend is simply to describe the structures covered by the Illinois Act.

[2] In light of our holding today that § 4–10 is not preempted by ERISA, the propriety of this ruling is questionable; a suit to compel compliance with § 4–10 in the context of an ERISA plan would seem to be akin to a suit to compel compliance with the terms of a plan under 29 U. S. C. § 1132(a)(3). Alternatively, the proper course may have been to bring a suit to recover benefits due, alleging that the denial was improper in the absence of compliance with § 4–10. We need not resolve today which of these options is more consonant with ERISA.

Group Coverage, as well as his own medical judgment. Rush's medical director, however, refused to concede that the surgery had been medically necessary, and denied Moran's claim in January 1999.

Moran amended her complaint in state court to seek reimbursement for the surgery as "medically necessary" under Illinois's HMO Act, and Rush again removed to federal court, arguing that Moran's amended complaint stated a claim for ERISA benefits and was thus completely preempted by ERISA's civil enforcement provisions, 29 U. S. C. § 1132(a), as construed by this Court in *Metropolitan Life Ins. Co.* v. *Taylor*, 481 U. S. 58 (1987). The District Court treated Moran's claim as a suit under ERISA, and denied the claim on the ground that ERISA preempted Illinois's independent review statute.[3]

The Court of Appeals for the Seventh Circuit reversed. 230 F. 3d 959 (2000). Although it found Moran's state-law reimbursement claim completely preempted by ERISA so as to place the case in federal court, the Seventh Circuit did not agree that the substantive provisions of Illinois's HMO Act were so preempted. The court noted that although ERISA broadly preempts any state laws that "relate to" employee benefit plans, 29 U. S. C. § 1144(a), state laws that "regulat[e]

---

[3] No party has challenged Rush's status as defendant in this case, despite the fact that many lower courts have interpreted ERISA to permit suits under § 1132(a) only against ERISA plans, administrators, or fiduciaries. See, *e. g., Everhart* v. *Allmerica Financial Life Ins. Co.*, 275 F. 3d 751, 754–756 (CA9 2001); *Garren* v. *John Hancock Mut. Life Ins. Co.*, 114 F. 3d 186, 187 (CA11 1997); *Jass* v. *Prudential Health Care Plan, Inc.*, 88 F. 3d 1482, 1490 (CA7 1996). Without commenting on the correctness of such holdings, we assume (although the information does not appear in the record) that Rush has failed to challenge its status as defendant because it is, in fact, the plan administrator. This conclusion is buttressed by the fact that the plan's sponsor has granted Rush discretion to interpret the terms of its coverage, and by the fact that one of Rush's challenges to the Illinois statute is based on what Rush perceives as the limits that statute places on fiduciary discretion. Whatever Rush's true status may be, however, it is immaterial to our holding.

insurance" are saved from preemption, § 1144(b)(2)(A). The court held that the Illinois HMO Act was such a law, the independent review requirement being little different from a state-mandated contractual term of the sort this Court had held to survive ERISA preemption. See 230 F. 3d, at 972 (citing *UNUM Life Ins. Co. of America* v. *Ward*, 526 U. S. 358, 375–376 (1999)). The Seventh Circuit rejected the contention that Illinois's independent review requirement constituted a forbidden "alternative remedy" under this Court's holding in *Pilot Life Ins. Co.* v. *Dedeaux*, 481 U. S. 41 (1987), and emphasized that § 4-10 does not authorize any particular form of relief in state courts; rather, with respect to any ERISA health plan, the judgment of the independent reviewer is only enforceable in an action brought under ERISA's civil enforcement scheme, 29 U. S. C. § 1132(a). 230 F. 3d, at 971.

Because the decision of the Court of Appeals conflicted with the Fifth Circuit's treatment of a similar provision of Texas law in *Corporate Health Ins., Inc.* v. *Texas Dept. of Ins.*, 215 F. 3d 526 (2000), we granted certiorari, 533 U. S. 948 (2001). We now affirm.

## II

To "safeguar[d] . . . the establishment, operation, and administration" of employee benefit plans, ERISA sets "minimum standards . . . assuring the equitable character of such plans and their financial soundness," 29 U. S. C. § 1001(a), and contains an express preemption provision that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . . ." § 1144(a). A saving clause then reclaims a substantial amount of ground with its provision that "nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities." § 1144(b)(2)(A). The "unhelpful" drafting of these antiphonal clauses, *New York State Confer-*

ence of *Blue Cross & Blue Shield Plans* v. *Travelers Ins. Co.*, 514 U. S. 645, 656 (1995), occupies a substantial share of this Court's time, see, *e. g., Egelhoff* v. *Egelhoff*, 532 U. S. 141 (2001); *UNUM Life Ins. Co. of America* v. *Ward, supra; California Div. of Labor Standards Enforcement* v. *Dillingham Constr., N. A., Inc.*, 519 U. S. 316 (1997); *Metropolitan Life Ins. Co.* v. *Massachusetts*, 471 U. S. 724 (1985). In trying to extrapolate congressional intent in a case like this, when congressional language seems simultaneously to preempt everything and hardly anything, we "have no choice" but to temper the assumption that "'the ordinary meaning . . . accurately expresses the legislative purpose,'" *id.*, at 740 (quoting *Park 'N Fly* v. *Dollar Park & Fly, Inc.*, 469 U. S. 189, 194 (1985)), with the qualification "'that the historic police powers of the States were not [meant] to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Travelers, supra*, at 655 (quoting *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230 (1947)).

It is beyond serious dispute that under existing precedent § 4–10 of the Illinois HMO Act "relates to" employee benefit plans within the meaning of § 1144(a). The state law bears "indirectly but substantially on all insured benefit plans," *Metropolitan Life*, 471 U. S., at 739, by requiring them to submit to an extra layer of review for certain benefit denials if they purchase medical coverage from any of the common types of health care organizations covered by the state law's definition of HMO. As a law that "relates to" ERISA plans under § 1144(a), § 4–10 is saved from preemption only if it also "regulates insurance" under § 1144(b)(2)(A). Rush insists that the Act is not such a law.

## A

In *Metropolitan Life*, we said that in deciding whether a law "regulates insurance" under ERISA's saving clause, we start with a "common-sense view of the matter," 471 U. S.,

at 740, under which "a law must not just have an impact on the insurance industry, but must be specifically directed toward that industry." *Pilot Life Ins. Co.* v. *Dedeaux, supra,* at 50. We then test the results of the commonsense enquiry by employing the three factors used to point to insurance laws spared from federal preemption under the McCarran-Ferguson Act, 15 U. S. C. § 1011 *et seq.*[4] Although this is not the place to plot the exact perimeter of the saving clause, it is generally fair to think of the combined "commonsense" and McCarran-Ferguson factors as parsing the "who" and the "what": when insurers are regulated with respect to their insurance practices, the state law survives ERISA. Cf. *Group Life & Health Ins. Co.* v. *Royal Drug Co.,* 440 U. S. 205, 211 (1979) (explaining that the "business of insurance" is not coextensive with the "business of insurers").

1

The commonsense enquiry focuses on "primary elements of an insurance contract[, which] are the spreading and underwriting of a policyholder's risk." *Ibid.* The Illinois statute addresses these elements by defining "health maintenance organization" by reference to the risk that it bears. See 215 Ill. Comp. Stat., ch. 125, § 1–2(9) (2000) (an HMO "provide[s] or arrange[s] for . . . health care plans under a system which causes any part of the risk of health care delivery to be borne by the organization or its providers").

Rush contends that seeing an HMO as an insurer distorts the nature of an HMO, which is, after all, a health care provider, too. This, Rush argues, should determine its characterization, with the consequence that regulation of an HMO is not insurance regulation within the meaning of ERISA.

---

[4] The McCarran-Ferguson Act requires that the business of insurance be subject to state regulation, and, subject to certain exceptions, mandates that "[n]o Act of Congress shall be construed to invalidate . . . any law enacted by any State for the purpose of regulating the business of insurance . . . ." 15 U. S. C. § 1012(b).

The answer to Rush is, of course, that an HMO is both: it provides health care, and it does so as an insurer. Nothing in the saving clause requires an either-or choice between health care and insurance in deciding a preemption question, and as long as providing insurance fairly accounts for the application of state law, the saving clause may apply. There is no serious question about that here, for it would ignore the whole purpose of the HMO-style of organization to conceive of HMOs (even in the traditional sense, see n. 1, *supra*) without their insurance element.

"The defining feature of an HMO is receipt of a fixed fee for each patient enrolled under the terms of a contract to provide specified health care if needed." *Pegram* v. *Herdrich,* 530 U. S. 211, 218 (2000). "The HMO thus assumes the financial risk of providing the benefits promised: if a participant never gets sick, the HMO keeps the money regardless, and if a participant becomes expensively ill, the HMO is responsible for the treatment . . . ." *Id.,* at 218–219. The HMO design goes beyond the simple truism that all contracts are, in some sense, insurance against future fluctuations in price, R. Posner, Economic Analysis of Law 104 (4th ed. 1992), because HMOs actually underwrite and spread risk among their participants, see, *e. g.,* R. Shouldice, Introduction to Managed Care 450–462 (1991), a feature distinctive to insurance, see, *e. g., SEC* v. *Variable Annuity Life Ins. Co. of America,* 359 U. S. 65, 73 (1959) (underwriting of risk is an "earmark of insurance as it has commonly been conceived of in popular understanding and usage"); *Royal Drug, supra,* at 214–215, n. 12 ("[U]nless there is some element of spreading risk more widely, there is no underwriting of risk").

So Congress has understood from the start, when the phrase "Health Maintenance Organization" was established and defined in the HMO Act of 1973. The Act was intended to encourage the development of HMOs as a new form of health care delivery system, see S. Rep. No. 93–129, pp. 7–9

(1973), and when Congress set the standards that the new health delivery organizations would have to meet to get certain federal benefits, the terms included requirements that the organizations bear and manage risk. See, *e. g.*, Health Maintenance Organization Act of 1973, § 1301(c), 87 Stat. 916, as amended, 42 U. S. C. § 300e(c); S. Rep. No. 93–129, at 14 (explaining that HMOs necessarily bear some of the risk of providing service, and requiring that a qualifying HMO "assum[e] direct financial responsibility, without benefit of reinsurance, for care . . . in excess of the first five thousand dollars per enrollee per year"). The Senate Committee Report explained that federally qualified HMOs would be required to provide "a basic package of benefits, consistent with existing health insurance patterns," *id.*, at 10, and the very text of the Act assumed that state insurance laws would apply to HMOs; it provided that to the extent state insurance capitalization and reserve requirements were too stringent to permit the formation of HMOs, "qualified" HMOs would be exempt from such limiting regulation. See § 1311, 42 U. S. C. § 300e–10. This congressional understanding that it was promoting a novel form of insurance was made explicit in the Senate Report's reference to the practices of "health insurers to charge premium rates based upon the actual claims experience of a particular group of subscribers," thus "raising costs and diminishing the availability of health insurance for those suffering from costly illnesses," S. Rep. No. 93–129, at 29–30. The federal Act responded to this insurance practice by requiring qualifying HMOs to adopt uniform capitation rates, see § 1301(b), 42 U. S. C. § 300e(b), and it was because of that mandate "pos[ing] substantial competitive problems to newly emerging HMOs," S. Rep. No. 93–129, at 30, that Congress authorized funding subsidies, see § 1304, 42 U. S. C. § 300e–4. The Senate explanation left no doubt that it viewed an HMO as an insurer; the subsidy was justified because "the same stringent requirements do not apply to other indemnity or service benefits insurance plans."

S. Rep. No. 93–129, at 30. In other words, one year before it passed ERISA, Congress itself defined HMOs in part by reference to risk, set minimum standards for managing the risk, showed awareness that States regulated HMOs as insurers, and compared HMOs to "indemnity or service benefits insurance plans."

This conception has not changed in the intervening years. Since passage of the federal Act, States have been adopting their own HMO enabling Acts, and today, at least 40 of them, including Illinois, regulate HMOs primarily through the States' insurance departments, see Aspen Health Law and Compliance Center, Managed Care Law Manual 31–32 (Supp. 6, Nov. 1997), although they may be treated differently from traditional insurers, owing to their additional role as health care providers,[5] see, e. g., Alaska Ins. Code § 21.86.010 (2000) (health department reviews HMO before insurance commissioner grants a certificate of authority); Ohio Rev. Code Ann. § 1742.21 (West 1994) (health department may inspect HMO). Finally, this view shared by Congress and the States has passed into common understanding. HMOs (broadly defined) have "grown explosively in the past decade and [are] now the dominant form of health plan coverage for privately insured individuals." Gold & Hurley, The Role of Managed Care "Products" in Managed Care "Plans," in Contemporary Managed Care 47 (M. Gold ed. 1998). While the original form of the HMO was a single corporation employing its own physicians, the 1980's saw a variety of other types of structures develop even as traditional insurers altered their own

---

[5] We have, in a limited number of cases, found certain contracts not to be part of the "business of insurance" under McCarran-Ferguson, notwithstanding their classification as such for the purpose of state regulation. See, e. g., SEC v. Variable Annuity Life Ins. Co. of America, 359 U. S. 65 (1959). Even then, however, we recognized that such classifications are relevant to the enquiry, because Congress, in leaving the "business of insurance" to the States, "was legislating concerning a concept which had taken on its coloration and meaning largely from state law, from state practice, from state usage." Id., at 69.

plans by adopting HMO-like cost-control measures. See Weiner & de Lissovoy, Razing a Tower of Babel: A Taxonomy for Managed Care and Health Insurance Plans, 18 J. of Health Politics, Policy and Law 75, 83 (Spring 1993). The dominant feature is the combination of insurer and provider, see Gold & Hurley, *supra*, at 47, and "an observer may be hard pressed to uncover the differences among products that bill themselves as HMOs, [preferred provider organizations], or managed care overlays to health insurance," Managed Care Law Manual, *supra*, at 1. Thus, virtually all commentators on the American health care system describe HMOs as a combination of insurer and provider, and observe that in recent years, traditional "indemnity" insurance has fallen out of favor. See, *e. g.*, Weiner & de Lissovoy, *supra*, at 77 ("A common characteristic of the new managed care plans was the degree to which the roles of insurer and provider became integrated"); Gold, Understanding the Roots: Health Maintenance Organizations in Historical Context, in Contemporary Managed Care, *supra*, at 7, 8, 13; Managed Care Law Manual, *supra*, at 1; R. Rosenblatt, S. Law, & S. Rosenbaum, Law and the American Health Care System 552 (1997); Shouldice, Introduction to Managed Care, at 13, 20. Rush cannot checkmate common sense by trying to submerge HMOs' insurance features beneath an exclusive characterization of HMOs as providers of health care.

### 2

On a second tack, Rush and its *amici* dispute that §4–10 is aimed specifically at the insurance industry. They say the law sweeps too broadly with definitions capturing organizations that provide no insurance, and by regulating noninsurance activities of HMOs that do. Rush points out that Illinois law defines HMOs to include organizations that cause the risk of health care delivery to be borne by the organization itself, or by "its providers." 215 Ill. Comp. Stat., ch. 125, § 1–2(9) (2000). In Rush's view, the reference to "its

providers" suggests that an organization may be an HMO under state law (and subject to § 4–10) even if it does not bear risk itself, either because it has "devolve[d]" the risk of health care delivery onto others, or because it has contracted only to provide "administrative" or other services for self-funded plans. Brief for Petitioner 38.

These arguments, however, are built on unsound assumptions. Rush's first contention assumes that an HMO is no longer an insurer when it arranges to limit its exposure, as when an HMO arranges for capitated contracts to compensate its affiliated physicians with a set fee for each HMO patient regardless of the treatment provided. Under such an arrangement, Rush claims, the risk is not borne by the HMO at all. In a similar vein, Rush points out that HMOs may contract with third-party insurers to protect themselves against large claims.

The problem with Rush's argument is simply that a reinsurance contract does not take the primary insurer out of the insurance business, cf. *Hartford Fire Ins. Co.* v. *California,* 509 U. S. 764 (1993) (applying McCarran-Ferguson to a dispute involving primary insurers and reinsurers); *id.,* at 772–773 ("[P]rimary insurers . . . usually purchase insurance to cover a portion of the risk they assume from the consumer"), and capitation contracts do not relieve the HMO of its obligations to the beneficiary. The HMO is still bound to provide medical care to its members, and this is so regardless of the ability of physicians or third-party insurers to honor their contracts with the HMO.

Nor do we see anything standing in the way of applying the saving clause if we assume that the general state definition of HMO would include a contractor that provides only administrative services for a self-funded plan.[6]  Rush points

---

[6] ERISA's "deemer" clause provides an exception to its saving clause that prohibits States from regulating self-funded plans as insurers. See 29 U. S. C. § 1144(b)(2)(B); *FMC Corp.* v. *Holliday,* 498 U. S. 52, 61 (1990). Therefore, Illinois's Act would not be "saved" as an insurance law to the

out that the general definition of HMO under Illinois law includes not only organizations that "provide" health care plans, but those that "arrange for" them to be provided, so long as "any part of the risk of health care delivery" rests upon "the organization or its providers." 215 Ill. Comp. Stat., ch. 125, § 1–2(9) (2000). See Brief for Petitioner 38. Rush hypothesizes a sort of medical matchmaker, bringing together ERISA plans and medical care providers; even if the latter bear all the risks, the matchmaker would be an HMO under the Illinois definition. Rush would conclude from this that § 4–10 covers noninsurers, and so is not directed specifically to the insurance industry. Ergo, ERISA's saving clause would not apply.

It is far from clear, though, that the terms of § 4–10 would even theoretically apply to the matchmaker, for the requirement that the HMO "provide" the covered service if the independent reviewer finds it medically necessary seems to assume that the HMO in question is a provider, not the mere arranger mentioned in the general definition of an HMO. Even on the most generous reading of Rush's argument, however, it boils down to the bare possibility (not the likelihood) of some overbreadth in the application of § 4–10 beyond orthodox HMOs, and there is no reason to think Congress would have meant such minimal application to noninsurers to remove a state law entirely from the category of insurance regulation saved from preemption.

In sum, prior to ERISA's passage, Congress demonstrated an awareness of HMOs as risk-bearing organizations subject to state insurance regulation, the state Act defines HMOs by reference to risk bearing, HMOs have taken over much business formerly performed by traditional indemnity insurers, and they are almost universally regulated as insurers under state law. That HMOs are not traditional "indem-

---

extent it applied to self-funded plans. This fact, however, does not bear on Rush's challenge to the law as one that is targeted toward non-risk-bearing organizations.

nity" insurers is no matter; "we would not undertake to freeze the concepts of 'insurance' . . . into the mold they fitted when these Federal Acts were passed." *SEC* v. *Variable Annuity Life Ins. Co. of America*, 359 U. S., at 71. Thus, the Illinois HMO Act is a law "directed toward" the insurance industry, and an "insurance regulation" under a "commonsense" view.

B

The McCarran-Ferguson factors confirm our conclusion. A law regulating insurance for McCarran-Ferguson purposes targets practices or provisions that "ha[ve] the effect of transferring or spreading a policyholder's risk; . . . [that are] an integral part of the policy relationship between the insurer and the insured; and [are] limited to entities within the insurance industry." *Union Labor Life Ins. Co.* v. *Pireno*, 458 U. S. 119, 129 (1982). Because the factors are guideposts, a state law is not required to satisfy all three McCarran-Ferguson criteria to survive preemption, see *UNUM Life Ins. Co.* v. *Ward*, 526 U. S., at 373, and so we follow our precedent and leave open whether the review mandated here may be described as going to a practice that "spread[s] a policyholder's risk." For in any event, the second and third factors are clearly satisfied by § 4–10.

It is obvious enough that the independent review requirement regulates "an integral part of the policy relationship between the insurer and the insured." Illinois adds an extra layer of review when there is internal disagreement about an HMO's denial of coverage. The reviewer applies both a standard of medical care (medical necessity) and characteristically, as in this case, construes policy terms. Cf. *Pegram* v. *Herdrich*, 530 U. S., at 228–229. The review affects the "policy relationship" between HMO and covered persons by translating the relationship under the HMO agreement into concrete terms of specific obligation or freedom from duty. Hence our repeated statements that the interpretation of insurance contracts is at the "core" of the business of

insurance. *E. g., SEC* v. *National Securities, Inc.*, 393 U. S. 453, 460 (1969).

Rush says otherwise, citing *Union Labor Life Ins. Co.* v. *Pireno, supra,* and insisting that that case holds external review of coverage decisions to be outside the "policy relationship." But Rush misreads *Pireno.* We held there that an insurer's use of a "peer review" committee to gauge the necessity of particular treatments was not a practice integral to the policy relationship for the purposes of McCarran-Ferguson. 458 U. S., at 131–132. We emphasized, however, that the insurer's resort to peer review was simply the insurer's unilateral choice to seek advice if and when it cared to do so. The policy said nothing on the matter. The insurer's contract for advice from a third party was no concern of the insured, who was not bound by the peer review committee's recommendation any more, for that matter, than the insurer was. Thus it was not too much of an exaggeration to conclude that the practice was "a matter of indifference to the policyholder," *id.,* at 132. Section 4–10, by contrast, is different on all counts, providing as it does a legal right to the insured, enforceable against the HMO, to obtain an authoritative determination of the HMO's medical obligations.

The final factor, that the law be aimed at a "practice . . . limited to entities within the insurance industry," *id.,* at 129, is satisfied for many of the same reasons that the law passes the commonsense test. The law regulates application of HMO contracts and provides for review of claim denials; once it is established that HMO contracts are, in fact, contracts for insurance (and not merely contracts for medical care), it is clear that § 4–10 does not apply to entities outside the insurance industry (although it does not, of course, apply to all entities within it).

Even if we accepted Rush's contention, rejected already, that the law regulates HMOs even when they act as pure administrators, we would still find the third factor satisfied.

That factor requires the targets of the law to be limited to entities within the insurance industry, and even a matchmaking HMO would fall within the insurance industry. But the implausibility of Rush's hypothesis that the pure administrator would be bound by § 4–10 obviates any need to say more under this third factor. Cf. *Barnett Bank of Marion Cty., N. A.* v. *Nelson,* 517 U. S. 25, 39 (1996) (holding that a federal statute permitting banks to act as agents of insurance companies, although not insurers themselves, was a statute regulating the "business of insurance" for McCarran-Ferguson purposes).

## III

Given that § 4–10 regulates insurance, ERISA's mandate that "nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance," 29 U. S. C. § 1144(b)(2)(A), ostensibly forecloses preemption. See *Metropolitan Life,* 471 U. S., at 746 ("If a state law 'regulates insurance,' . . . it is not preempted"). Rush, however, does not give up. It argues for preemption anyway, emphasizing that the question is ultimately one of congressional intent, which sometimes is so clear that it overrides a statutory provision designed to save state law from being preempted. See *American Telephone & Telegraph Co.* v. *Central Office Telephone, Inc.,* 524 U. S. 214, 227 (1998) *(AT&T)* (clause in Communications Act of 1934 purporting to save "the remedies now existing at common law or by statute," 47 U. S. C. § 414 (1994 ed.), defeated by overriding policy of the filed-rate doctrine); *Adams Express Co.* v. *Croninger,* 226 U. S. 491, 507 (1913) (saving clause will not sanction state laws that would nullify policy expressed in federal statute; "the act cannot be said to destroy itself" (internal quotation marks omitted)).

In ERISA law, we have recognized one example of this sort of overpowering federal policy in the civil enforcement provisions, 29 U. S. C. § 1132(a), authorizing civil actions for

six specific types of relief.[7] In *Massachusetts Mut. Life Ins. Co.* v. *Russell,* 473 U. S. 134 (1985), we said those provisions amounted to an "interlocking, interrelated, and interdependent remedial scheme," *id.,* at 146, which *Pilot Life* described as "represent[ing] a careful balancing of the need for prompt and fair claims settlement procedures against the public interest in encouraging the formation of employee benefit plans," 481 U. S., at 54. So, we have held, the civil enforcement provisions are of such extraordinarily preemptive power that they override even the "well-pleaded complaint" rule for establishing the conditions under which a cause of action may be removed to a federal forum. *Metropolitan Life Ins. Co.* v. *Taylor,* 481 U. S., at 63–64.

---

[7] Title 29 U. S. C. § 1132(a) provides in relevant part:

"A civil action may be brought—

"(1) by a participant or beneficiary—

"(A) for the relief provided for in subsection (c) of this section [concerning requests to the administrator for information], or

"(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

"(2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title [breach of fiduciary duty];

"(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan;

"(4) by the Secretary, or by a participant, or beneficiary for appropriate relief in the case of a violation of 1025(c) of this title [information·to be furnished to participants];

"(5) except as otherwise provided in subsection (b) of this section, by the Secretary (A) to enjoin any act or practice which violates any provision of this subchapter, or (B) to obtain other appropriate equitable relief (i) to redress such violation or (ii) to enforce any provision of this subchapter;

"(6) by the Secretary to collect any civil penalty under paragraph (2), (4), (5), or (6) of subsection (c) of this section or under subsection (i) or (*l*) of this section."

## A

Although we have yet to encounter a forced choice between the congressional policies of exclusively federal remedies and the "reservation of the business of insurance to the States," *Metropolitan Life*, 471 U. S., at 744, n. 21, we have anticipated such a conflict, with the state insurance regulation losing out if it allows plan participants "to obtain remedies . . . that Congress rejected in ERISA," *Pilot Life, supra*, at 54.

In *Pilot Life*, an ERISA plan participant who had been denied benefits sued in a state court on state tort and contract claims. He sought not merely damages for breach of contract, but also damages for emotional distress and punitive damages, both of which we had held unavailable under relevant ERISA provisions. *Russell, supra*, at 148. We not only rejected the notion that these common law contract claims "regulat[ed] insurance," *Pilot Life*, 481 U. S., at 50–51, but went on to say that, regardless, Congress intended a "federal common law of rights and obligations" to develop under ERISA, *id.*, at 56, without embellishment by independent state remedies. As in *AT&T*, we said the saving clause had to stop short of subverting congressional intent, clearly expressed "through the structure and legislative history[,] that the federal remedy . . . displace state causes of action." 481 U. S., at 57.[8]

Rush says that the day has come to turn dictum into holding by declaring that the state insurance regulation, § 4–10, is preempted for creating just the kind of "alternative remedy" we disparaged in *Pilot Life*. As Rush sees it, the inde-

---

[8] Rush and its *amici* interpret *Pilot Life* to have gone a step further to hold that any law that presents such a conflict with federal goals is simply not a law that "regulates insurance," however else the "insurance" test comes out. We believe the point is largely academic. As will be discussed further, even under Rush's approach, a court must still determine whether the state law at issue does, in fact, create such a conflict. Thus, we believe that it is more logical to proceed as we have done here.

pendent review procedure is a form of binding arbitration that allows an ERISA beneficiary to submit claims to a new decisionmaker to examine Rush's determination *de novo,* supplanting judicial review under the "arbitrary and capricious" standard ordinarily applied when discretionary plan interpretations are challenged. *Firestone Tire & Rubber Co.* v. *Bruch,* 489 U. S. 101, 110–112 (1989). Rush says that the beneficiary's option falls within *Pilot Life's* notion of a remedy that "supplement[s] or supplant[s]" the remedies available under ERISA. 481 U. S., at 56.

We think, however, that Rush overstates the rule expressed in *Pilot Life.* The enquiry into state processes alleged to "supplemen[t] or supplan[t]" the federal scheme by allowing beneficiaries "to obtain remedies under state law that Congress rejected in ERISA," *id.,* at 54, has, up to now, been far more straightforward than it is here. The first case touching on the point did not involve preemption at all; it arose from an ERISA beneficiary's reliance on ERISA's own enforcement scheme to claim a private right of action for types of damages beyond those expressly provided. *Russell,* 473 U. S., at 145. We concluded that Congress had not intended causes of action under ERISA itself beyond those specified in § 1132(a). *Id.,* at 148. Two years later we determined in *Metropolitan Life Ins. Co.* v. *Taylor, supra,* that Congress had so completely preempted the field of benefits law that an ostensibly state cause of action for benefits was necessarily a "creature of federal law" removable to federal court. *Id.,* at 64 (internal quotation marks omitted). *Russell* and *Taylor* naturally led to the holding in *Pilot Life* that ERISA would not tolerate a diversity action seeking monetary damages for breach generally and for consequential emotional distress, neither of which Congress had authorized in § 1132(a). These monetary awards were claimed as remedies to be provided at the ultimate step of plan enforcement, and even if they could have been characterized as products of "insurance regulation," they would have signifi-

cantly expanded the potential scope of ultimate liability imposed upon employers by the ERISA scheme.

Since *Pilot Life,* we have found only one other state law to "conflict" with § 1132(a) in providing a prohibited alternative remedy. In *Ingersoll-Rand Co.* v. *McClendon,* 498 U. S. 133 (1990), we had no trouble finding that Texas's tort of wrongful discharge, turning on an employer's motivation to avoid paying pension benefits, conflicted with ERISA enforcement; while state law duplicated the elements of a claim available under ERISA, it converted the remedy from an equitable one under § 1132(a)(3) (available exclusively in federal district courts) into a legal one for money damages (available in a state tribunal). Thus, *Ingersoll-Rand* fit within the category of state laws *Pilot Life* had held to be incompatible with ERISA's enforcement scheme; the law provided a form of ultimate relief in a judicial forum that added to the judicial remedies provided by ERISA. Any such provision patently violates ERISA's policy of inducing employers to offer benefits by assuring a predictable set of liabilities, under uniform standards of primary conduct and a uniform regime of ultimate remedial orders and awards when a violation has occurred. See *Pilot Life, supra,* at 56 ("'The uniformity of decision . . . will help administrators . . . predict the legality of proposed actions without the necessity of reference to varying state laws'" (quoting H. R. Rep. No. 93–533, p. 12 (1973))); 481 U. S., at 56 ("The expectations that a federal common law of rights and obligations under ERISA-regulated plans would develop . . . would make little sense if the remedies available to ERISA participants and beneficiaries under [§ 1132(a)] could be supplemented or supplanted by varying state laws").

But this case addresses a state regulatory scheme that provides no new cause of action under state law and authorizes no new form of ultimate relief. While independent review under § 4–10 may well settle the fate of a benefit claim under a particular contract, the state statute does not en-

large the claim beyond the benefits available in any action brought under § 1132(a). And although the reviewer's determination would presumably replace that of the HMO as to what is "medically necessary" under this contract,[9] the relief ultimately available would still be what ERISA authorizes in a suit for benefits under § 1132(a).[10] This case therefore does not involve the sort of additional claim or remedy exemplified in *Pilot Life, Russell,* and *Ingersoll-Rand,* but instead bears a resemblance to the claims-procedure rule that we sustained in *UNUM Life Ins. Co. of America* v. *Ward,* 526 U. S. 358 (1999), holding that a state law barring enforcement of a policy's time limitation on submitting claims did not conflict with § 1132(a), even though the state "rule of decision," *id.,* at 377, could mean the difference between success and failure for a beneficiary. The procedure provided by § 4–10 does not fall within *Pilot Life*'s categorical preemption.

---

[9] The parties do not dispute that § 4–10, as a matter of state law, purports to make the independent reviewer's judgment dispositive as to what is "medically necessary." We accept this interpretation of the meaning of the statute for the purposes of our opinion.

[10] This is not to say that the court would have no role beyond ordering compliance with the reviewer's determination. The court would have the responsibility, for example, to fashion appropriate relief, or to determine whether other aspects of the plan (beyond the "medical necessity" of a particular treatment) affect the relative rights of the parties. Rush, for example, has chosen to guarantee medically necessary services to plan participants. For that reason, to the extent § 4–10 may render the independent reviewer the final word on what is necessary, see n. 9, *supra,* Rush is obligated to provide the service. But insurance contracts do not have to contain such guarantees, and not all do. Some, for instance, guarantee medically necessary care, but then modify that obligation by excluding experimental procedures from coverage. See, *e. g., Tillery* v. *Hoffman Enclosures, Inc.,* 280 F. 3d 1192 (CA8 2002). Obviously, § 4–10 does not have anything to say about whether a proposed procedure is experimental. There is also the possibility, though we do not decide the issue today, that a reviewer's judgment could be challenged as inaccurate or biased, just as the decision of a plan fiduciary might be so challenged.

## B

Rush still argues for going beyond *Pilot Life*, making the preemption issue here one of degree, whether the state procedural imposition interferes unreasonably with Congress's intention to provide a uniform federal regime of "rights and obligations" under ERISA. However, "[s]uch disuniformities . . . are the inevitable result of the congressional decision to 'save' local insurance regulation." *Metropolitan Life*, 471 U. S., at 747.[11] Although we have recognized a limited exception from the saving clause for alternative causes of action and alternative remedies in the sense described above, we have never indicated that there might be additional justifications for qualifying the clause's application. Rush's arguments today convince us that further limits on insurance regulation preserved by ERISA are unlikely to deserve recognition.

To be sure, a State might provide for a type of "review" that would so resemble an adjudication as to fall within *Pilot Life*'s categorical bar. Rush, and the dissent, *post*, at 394 (opinion of THOMAS, J.), contend that § 4–10 fills that bill by imposing an alternative scheme of arbitral adjudication at

---

[11] Thus, we do not believe that the mere fact that state independent review laws are likely to entail different procedures will impose burdens on plan administration that would threaten the object of 29 U. S. C. § 1132(a); it is the HMO contracting with a plan, and not the plan itself, that will be subject to these regulations, and every HMO will have to establish procedures for conforming with the local laws, regardless of what this Court may think ERISA forbids. This means that there will be no special burden of compliance upon an ERISA plan beyond what the HMO has already provided for. And although the added compliance cost to the HMO may ultimately be passed on to the ERISA plan, we have said that such "indirect economic effect[s]," *New York State Conference of Blue Cross & Blue Shield Plans* v. *Travelers Ins. Co.*, 514 U. S. 645, 659 (1995), are not enough to preempt state regulation even outside of the insurance context. We recognize, of course, that a State might enact an independent review requirement with procedures so elaborate, and burdens so onerous, that they might undermine § 1132(a). No such system is before us.

odds with the manifest congressional purpose to confine adjudication of disputes to the courts. It does not turn out to be this simple, however, and a closer look at the state law reveals a scheme significantly different from common arbitration as a way of construing and applying contract terms.

In the classic sense, arbitration occurs when "parties in dispute choose a judge to render a final and binding decision on the merits of the controversy and on the basis of proofs presented by the parties." 1 I. MacNeil, R. Speidel, & T. Stipanowich, Federal Arbitration Law § 2.1.1 (1995) (internal quotation marks omitted); see also Uniform Arbitration Act § 5, 7 U. L. A. 173 (1997) (discussing submission evidence and empowering arbitrator to "hear and determine the controversy upon the evidence produced"); Commercial Dispute Resolution Procedures of the American Arbitration Association ¶¶ R33–R35 (Sept. 2000) (discussing the taking of evidence). Arbitrators typically hold hearings at which parties may submit evidence and conduct cross-examinations, *e. g.,* Uniform Arbitration Act § 5, and are often invested with many powers over the dispute and the parties, including the power to subpoena witnesses and administer oaths, *e. g.,* Federal Arbitration Act, 9 U. S. C. § 7; 28 U. S. C. § 653; Uniform Arbitration Act § 7, 7 U. L. A., at 199; Cal. Civ. Proc. Code Ann. §§ 1282.6, 1282.8 (West 1982).

Section 4–10 does resemble an arbitration provision, then, to the extent that the independent reviewer considers disputes about the meaning of the HMO contract[12] and receives "evidence" in the form of medical records, statements from

---

[12] Nothing in the Act states that the reviewer should refer to the definitions of medical necessity contained in the contract, but the reviewer did, in this case, refer to that definition. Thus, we will assume that some degree of contract interpretation is required under the Act. Were no interpretation required, there would be a real question as to whether § 4–10 is properly characterized as a species of mandated-benefit law of the type we approved in *Metropolitan Life Ins. Co.* v. *Massachusetts,* 471 U. S. 724 (1985).

physicians, and the like. But this is as far as the resemblance to arbitration goes, for the other features of review under § 4–10 give the proceeding a different character, one not at all at odds with the policy behind § 1132(a). The Act does not give the independent reviewer a free-ranging power to construe contract terms, but instead, confines review to a single term: the phrase "medical necessity," used to define the services covered under the contract. This limitation, in turn, implicates a feature of HMO benefit determinations that we described in *Pegram* v. *Herdrich*, 530 U. S. 211 (2000). We explained that when an HMO guarantees medically necessary care, determinations of coverage "cannot be untangled from physicians' judgments about reasonable medical treatment." *Id.*, at 229. This is just how the Illinois Act operates; the independent examiner must be a physician with credentials similar to those of the primary care physician, 215 Ill. Comp. Stat., ch. 125, § 4–10 (2000), and is expected to exercise independent medical judgment in deciding what medical necessity requires. Accordingly, the reviewer in this case did not hold the kind of conventional evidentiary hearing common in arbitration, but simply received medical records submitted by the parties, and ultimately came to a professional judgment of his own. Tr. of Oral Arg. 30–32.

Once this process is set in motion, it does not resemble either contract interpretation or evidentiary litigation before a neutral arbiter, as much as it looks like a practice (having nothing to do with arbitration) of obtaining another medical opinion. The reference to an independent reviewer is similar to the submission to a second physician, which many health insurers are required by law to provide before denying coverage.[13]

The practice of obtaining a second opinion, however, is far removed from any notion of an enforcement scheme, and

---

[13] See, *e. g.*, Cal. Ins. Code Ann. § 10123.68 (West Supp. 2002); Ind. Code § 27–13–37–5 (1999); N. J. Stat. Ann. § 17B:26–2.3 (1996); Okla. Admin. Code § 365:10–5–4 (1996); R. I. Gen. Laws § 27–39–2 (1998).

once § 4–10 is seen as something akin to a mandate for second-opinion practice in order to ensure sound medical judgments, the preemption argument that arbitration under § 4–10 supplants judicial enforcement runs out of steam.

Next, Rush argues that § 4–10 clashes with a substantive rule intended to be preserved by the system of uniform enforcement, stressing a feature of judicial review highly prized by benefit plans: a deferential standard for reviewing benefit denials. Whereas *Firestone Tire & Rubber Co.* v. *Bruch,* 489 U. S., at 115, recognized that an ERISA plan could be designed to grant "discretion" to a plan fiduciary, deserving deference from a court reviewing a discretionary judgment, § 4–10 provides that when a plan purchases medical services and insurance from an HMO, benefit denials are subject to apparently *de novo* review. If a plan should continue to balk at providing a service the reviewer has found medically necessary, the reviewer's determination could carry great weight in a subsequent suit for benefits under § 1132(a),[14] depriving the plan of the judicial deference a fiduciary's medical judgment might have obtained if judicial review of the plan's decision had been immediate.[15]

Again, however, the significance of § 4–10 is not wholly captured by Rush's argument, which requires some perspec-

---

[14] See n. 10, *supra.*

[15] An issue implicated by this case but requiring no resolution is the degree to which a plan provision for unfettered discretion in benefit determinations guarantees truly deferential review. In *Firestone Tire* itself, we noted that review for abuse of discretion would home in on any conflict of interest on the plan fiduciary's part, if a conflict was plausibly raised. That last observation was underscored only two Terms ago in *Pegram* v. *Herdrich,* 530 U. S. 211 (2000), when we again noted the potential for conflict when an HMO makes decisions about appropriate treatment, see *id.,* at 219–220. It is a fair question just how deferential the review can be when the judicial eye is peeled for conflict of interest. Moreover, as we explained in *Pegram,* "it is at least questionable whether Congress would have had mixed eligibility decisions in mind when it provided that decisions administering a plan were fiduciary in nature." *Id.,* at 232. Our decision today does not require us to resolve these questions.

tive for evaluation. First, in determining whether state procedural requirements deprive plan administrators of any right to a uniform standard of review, it is worth recalling that ERISA itself provides nothing about the standard. It simply requires plans to afford a beneficiary some mechanism for internal review of a benefit denial, 29 U. S. C. § 1133(2), and provides a right to a subsequent judicial forum for a claim to recover benefits, § 1132(a)(1)(B). Whatever the standards for reviewing benefit denials may be, they cannot conflict with anything in the text of the statute, which we have read to require a uniform judicial regime of categories of relief and standards of primary conduct, not a uniformly lenient regime of reviewing benefit determinations. See *Pilot Life*, 481 U. S., at 56.[16]

Not only is there no ERISA provision directly providing a lenient standard for judicial review of benefit denials, but there is no requirement necessarily entailing such an effect even indirectly. When this Court dealt with the review standards on which the statute was silent, we held that a general or default rule of *de novo* review could be replaced

---

[16] Rush presents the alternative argument that § 4–10 is preempted as conflicting with ERISA's requirement that a benefit denial be reviewed by a named fiduciary, 29 U. S. C. § 1133(2). Rush contends that § 4–10 interferes with fiduciary discretion by forcing the provision of benefits over a fiduciary's objection. Happily, we need not decide today whether § 1133(2) carries the same preemptive force of § 1132(a) such that it overrides even the express saving clause for insurance regulation, because we see no conflict. Section 1133 merely requires that plans provide internal appeals of benefit denials; § 4–10 plays no role in this process, instead providing for extra review once the internal process is complete. Nor is there any conflict in the removal of fiduciary "discretion"; as described below, ERISA does not require that such decisions be discretionary, and insurance regulation is not preempted merely because it conflicts with substantive plan terms. See *UNUM Life Ins. Co. of America* v. *Ward*, 526 U. S. 358, 376 (1999) ("Under [Petitioner's] interpretation . . . insurers could displace any state regulation simply by inserting a contrary term in plan documents. This interpretation would virtually rea[d] the saving clause out of ERISA" (internal quotation marks and citations omitted)).

by deferential review if the ERISA plan itself provided that the plan's benefit determinations were matters of high or unfettered discretion, see *Firestone Tire, supra,* at 115. Nothing in ERISA, however, requires that these kinds of decisions be so "discretionary" in the first place; whether they are is simply a matter of plan design or the drafting of an HMO contract. In this respect, then, § 4–10 prohibits designing an insurance contract so as to accord unfettered discretion to the insurer to interpret the contract's terms. As such, it does not implicate ERISA's enforcement scheme at all, and is no different from the types of substantive state regulation of insurance contracts we have in the past permitted to survive preemption, such as mandated-benefit statutes and statutes prohibiting the denial of claims solely on the ground of untimeliness.[17] See *Metropolitan Life Ins. Co.* v. *Massachusetts,* 471 U. S. 724 (1985); *UNUM Life Ins. Co. of America* v. *Ward,* 526 U. S. 358 (1999).

\*　　\*　　\*

In sum, § 4–10 imposes no new obligation or remedy like the causes of action considered in *Russell, Pilot Life,* and *Ingersoll-Rand.* Even in its formal guise, the State Act bears a closer resemblance to second-opinion requirements than to arbitration schemes. Deferential review in the HMO context is not a settled given; § 4–10 operates before the stage of judicial review; the independent reviewer's *de novo* examination of the benefit claim mirrors the general or

---

[17] We do not mean to imply that States are free to create other forms of binding arbitration to provide *de novo* review of any terms of insurance contracts; as discussed above, our decision rests in part on our recognition that the disuniformity Congress hoped to avoid is not implicated by decisions that are so heavily imbued with expert medical judgments. Rather, we hold that the feature of § 4–10 that provides a different standard of review with respect to mixed eligibility decisions from what would be available in court is not enough to create a conflict that undermines congressional policy in favor of uniformity of remedies.

default rule we have ourselves recognized; and its effect is no greater than that of mandated-benefit regulation.

In deciding what to make of these facts and conclusions, it helps to go back to where we started and recall the ways States regulate insurance in looking out for the welfare of their citizens. Illinois has chosen to regulate insurance as one way to regulate the practice of medicine, which we have previously held to be permissible under ERISA, see *Metropolitan Life*, 471 U. S., at 741. While the statute designed to do this undeniably eliminates whatever may have remained of a plan sponsor's option to minimize scrutiny of benefit denials, this effect of eliminating an insurer's autonomy to guarantee terms congenial to its own interests is the stuff of garden variety insurance regulation through the imposition of standard policy terms. See *id.*, at 742 ("[S]tate laws regulating the substantive terms of insurance contracts were commonplace well before the mid-70's"). It is therefore hard to imagine a reservation of state power to regulate insurance that would not be meant to cover restrictions of the insurer's advantage in this kind of way. And any lingering doubt about the reasonableness of § 4–10 in affecting the application of § 1132(a) may be put to rest by recalling that regulating insurance tied to what is medically necessary is probably inseparable from enforcing the quintessentially state-law standards of reasonable medical care. See *Pegram* v. *Herdrich*, 530 U. S., at 236. "[I]n the field of health care, a subject of traditional state regulation, there is no ERISA preemption without clear manifestation of congressional purpose." *Id.*, at 237. To the extent that benefit litigation in some federal courts may have to account for the effects of § 4–10, it would be an exaggeration to hold that the objectives of § 1132(a) are undermined. The saving clause is entitled to prevail here, and we affirm the judgment.

*It is so ordered.*

JUSTICE THOMAS, with whom THE CHIEF JUSTICE, JUS-
TICE SCALIA, and JUSTICE KENNEDY join, dissenting.

This Court has repeatedly recognized that ERISA's civil
enforcement provision, § 502 of the Employee Retirement In-
come Security Act of 1974 (ERISA), 29 U. S. C. § 1132, pro-
vides the exclusive vehicle for actions asserting a claim for
benefits under health plans governed by ERISA, and there-
fore that state laws that create additional remedies are pre-
empted. See, e. g., *Pilot Life Ins. Co.* v. *Dedeaux*, 481 U. S.
41, 52 (1987); *Massachusetts Mut. Life Ins. Co.* v. *Russell*,
473 U. S. 134, 146–147 (1985). Such exclusivity of remedies
is necessary to further Congress' interest in establishing a
uniform federal law of employee benefits so that employers
are encouraged to provide benefits to their employees: "To
require plan providers to design their programs in an envi-
ronment of differing state regulations would complicate the
administration of nationwide plans, producing inefficiencies
that employers might offset with decreased benefits." *FMC
Corp.* v. *Holliday*, 498 U. S. 52, 60 (1990).

Of course, the "expectations that a federal common law of
rights and obligations under ERISA-regulated plans would
develop . . . would make little sense if the remedies available
to ERISA participants and beneficiaries under § 502(a) could
be supplemented or supplanted by varying state laws."
*Pilot Life, supra,* at 56. Therefore, as the Court concedes,
see *ante,* at 377, even a state law that "regulates insurance"
may be pre-empted if it supplements the remedies provided
by ERISA, despite ERISA's saving clause, § 514(b)(2)(A), 29
U. S. C. § 1144(b)(2)(A). See *Silkwood* v. *Kerr-McGee Corp.,*
464 U. S. 238, 248 (1984) (noting that state laws that stand as
an obstacle to the accomplishment of the full purposes and
objectives of Congress are pre-empted).[1] Today, however,

---

[1] I would assume without deciding that 215 Ill. Comp. Stat., ch. 125,
§ 4–10 (2000) is a law that "regulates insurance." We can begin and end
the pre-emption analysis by asking if § 4–10 conflicts with the provisions

the Court takes the unprecedented step of allowing respondent Debra Moran to short circuit ERISA's remedial scheme by allowing her claim for benefits to be determined in the first instance through an arbitral-like procedure provided under Illinois law, and by a decisionmaker other than a court. See 215 Ill. Comp. Stat., ch. 125, § 4–10 (2000). This decision not only conflicts with our precedents, it also eviscerates the uniformity of ERISA remedies Congress deemed integral to the "careful balancing of the need for prompt and fair claims settlement procedures against the public interest in encouraging the formation of employee benefit plans." *Pilot Life, supra*, at 54. I would reverse the Court of Appeals' judgment and remand for a determination whether Moran was entitled to reimbursement absent the independent review conducted under § 4–10.

I

From the facts of this case one can readily understand why Moran sought recourse under § 4–10. Moran is covered by a medical benefits plan sponsored by her husband's employer and governed by ERISA. Petitioner Rush Prudential HMO, Inc., is the employer's health maintenance organization (HMO) provider for the plan. Petitioner's Member Certificate of Coverage (Certificate) details the scope of coverage under the plan and provides petitioner with "the broadest possible discretion" to interpret the terms of the plan and to determine participants' entitlement to benefits. 1 Record, Exh. A, p. 8. The Certificate specifically excludes from coverage services that are not "medically necessary." *Id.*, at 21. As the Court describes, *ante*, at 360–362, Moran underwent a nonstandard surgical procedure.[2] Prior to

of ERISA or operates to frustrate its objects. See, *e. g., Boggs* v. *Boggs*, 520 U. S. 833, 841 (1997).

[2] While the Court characterizes it as an "unconventional treatment," the Court of Appeals described this surgery more clinically as "rib resection, extensive scale-nectomy," and "microneurolysis of the lower roots of the brachial plexus under intraoperative microscopic magnification." 230

Moran's surgery, which was performed by an unaffiliated doctor, petitioner denied coverage for the procedure on at least three separate occasions, concluding that this surgery was not "medically necessary." For the same reason, petitioner denied Moran's request for postsurgery reimbursement in the amount of $94,841.27. Before finally determining that the specific treatment sought by Moran was not "medically necessary," petitioner consulted no fewer than six doctors, reviewed Moran's medical records, and consulted peer-reviewed medical literature.[3]

In the course of its review, petitioner informed Moran that "there is no prevailing opinion within the appropriate specialty of the United States medical profession that the procedure proposed [by Moran] is safe and effective for its intended use and that the omission of the procedure would adversely affect [her] medical condition." 1 Record, Exh. E, at 2. Petitioner did agree to cover the standard treatment for Moran's ailment, see n. 2, *supra*; n. 4, *infra*, concluding that peer-reviewed literature "demonstrates that [the standard surgery] is effective therapy in the treatment of [Moran's condition]." 1 Record, Exh. E, at 3.

Moran, however, was not satisfied with this option. After exhausting the plan's internal review mechanism, Moran

---

F. 3d 959, 963 (CA7 2000). The standard procedure for Moran's condition, as described by the Court of Appeals, involves (like the nonstandard surgery) rib resection with scale-nectomy, but it does not include "microneurolysis of the brachial plexus," which is the procedure Moran wanted and her primary care physician recommended. See *id.*, at 963–964. In any event, no one disputes that the procedure was not the standard surgical procedure for Moran's condition or that the Certificate covers even nonstandard surgery if it is "medically necessary."

[3] Petitioner thus appears to have complied with §503 of ERISA, which requires every employee benefit plan to "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied," and to "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U. S. C. §1133.

chose to bypass the relief provided by ERISA. She invoked § 4–10 of the Illinois HMO Act, which requires HMOs to provide a mechanism for review by an independent physician when the patient's primary care physician and HMO disagree about the medical necessity of a treatment proposed by the primary care physician. See 215 Ill. Comp. Stat., ch. 125, § 4–10 (2000). While Moran's primary care physician acknowledged that petitioner's affiliated surgeons had not recommended the unconventional surgery and that he was not "an expert in this or any other area of surgery," 1 Record, Exh. C, he nonetheless opined, without explanation, that Moran would be "best served" by having that surgery, *ibid.*

Dr. A. Lee Dellon, an unaffiliated physician who served as the independent medical reviewer, concluded that the surgery for which petitioner denied coverage "was appropriate," that it was "the same type of surgery" he would have done, and that Moran "had all of the indications and therefore the medical necessity to carry out" the nonstandard surgery. Appellant's Separate App. (CA7), pp. A42–A43.[4] Under § 4–10, Dr. Dellon's determination conclusively established Moran's right to benefits under Illinois law. See 215 Ill. Comp. Stat., ch. 125, § 4–10 ("In the event that the reviewing physician determines the covered service to be medically necessary, the [HMO] *shall provide* the covered service" (emphasis added)). 230 F. 3d 959, 972–973 (CA7 2000).

Nevertheless, petitioner again denied benefits, steadfastly maintaining that the unconventional surgery was not medically necessary. While the Court of Appeals recharacterized Moran's claim for reimbursement under § 4–10 as a claim for benefits under ERISA § 502(a)(1)(B), it reversed the judg-

---

[4] Even Dr. Dellon acknowledged, however, both that "[t]here is no particular research study" to determine whether failure to perform the nonstandard surgery would adversely affect Moran's medical condition and that the most common operation for Moran's condition in the United States was the standard surgery that petitioner had agreed to cover. Appellant's Separate App. (CA7), p. A43.

ment of the District Court based solely on Dr. Dellon's judgment that the surgery was "medically necessary."

## II

Section 514(a)'s broad language provides that ERISA "shall supersede any and all State laws insofar as they . . . relate to any employee benefit plan," except as provided in § 514(b). 29 U. S. C. § 1144(a). This language demonstrates "Congress's intent to establish the regulation of employee welfare benefit plans 'as exclusively a federal concern.'" *New York State Conference of Blue Cross & Blue Shield Plans* v. *Travelers Ins. Co.*, 514 U. S. 645, 656 (1995) (quoting *Alessi* v. *Raybestos-Manhattan, Inc.*, 451 U. S. 504, 523 (1981)). It was intended to "ensure that plans and plan sponsors would be subject to a uniform body of benefits law" so as to "minimize the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government" and to prevent "the potential for conflict in substantive law . . . requiring the tailoring of plans and employer conduct to the peculiarities of the law of each jurisdiction." *Ingersoll-Rand Co.* v. *McClendon*, 498 U. S. 133, 142 (1990). See also *Egelhoff* v. *Egelhoff*, 532 U. S. 141, 148 (2001).

To be sure, this broad goal of uniformity is in some tension with the so-called "saving clause," which provides that ERISA does not "exempt or relieve any person from any law of any State which regulates insurance, banking, or securities." § 514(b)(2)(A) of ERISA, 29 U. S. C. § 1144(b)(2)(A). As the Court has suggested on more than one occasion, the pre-emption and saving clauses are almost antithetically broad and "'are not a model of legislative drafting.'" *John Hancock Mut. Life Ins. Co.* v. *Harris Trust and Sav. Bank*, 510 U. S. 86, 99 (1993) (quoting *Pilot Life*, 481 U. S., at 46). But because there is "no solid basis for believing that Congress, when it designed ERISA, intended fundamentally to alter traditional pre-emption analysis," the Court has con-

cluded that federal pre-emption occurs where state law governing insurance "'stands as an obstacle to the accomplishment of the full purposes and objectives of Congress.'" *Harris Trust, supra,* at 99 (quoting *Silkwood,* 464 U. S., at 248).

Consequently, the Court until today had consistently held that state laws that seek to supplant or add to the exclusive remedies in § 502(a) of ERISA, 29 U. S. C. § 1132(a), are preempted because they conflict with Congress' objective that rights under ERISA plans are to be enforced under a uniform national system. See, *e. g., Ingersoll-Rand Co., supra,* at 142–145; *Metropolitan Life Ins. Co.* v. *Taylor,* 481 U. S. 58, 64–66 (1987); *Pilot Life, supra,* at 52–57. The Court has explained that § 502(a) creates an "interlocking, interrelated, and interdependent remedial scheme," and that a beneficiary who claims that he was wrongfully denied benefits has "a panoply of remedial devices" at his disposal. *Russell,* 473 U. S., at 146. It is exactly this enforcement scheme that *Pilot Life* described as "represent[ing] a careful balancing of the need for prompt and fair claims settlement procedures against the public interest in encouraging the formation of employee benefit plans," 481 U. S., at 54. Central to that balance is the development of "a federal common law of rights and obligations under ERISA-regulated plans." *Id.,* at 56.

In addressing the relationship between ERISA's remedies under § 502(a) and a state law regulating insurance, the Court has observed that "[t]he policy choices reflected in the inclusion of certain remedies and the exclusion of others under the federal scheme would be completely undermined if ERISA-plan participants and beneficiaries were free to obtain remedies under state law that Congress rejected in ERISA." *Id.,* at 54. Thus, while the preeminent federal interest in the uniform administration of employee benefit plans yields in some instances to varying state regulation of the business of insurance, the exclusivity and uniformity of

ERISA's enforcement scheme remains paramount. "Congress intended § 502(a) to be the exclusive remedy for rights guaranteed under ERISA." *Ingersoll-Rand Co.*, *supra*, at 144. In accordance with ordinary principles of conflict pre-emption, therefore, even a state law "regulating insurance" will be pre-empted if it provides a separate vehicle to assert a claim for benefits outside of, or in addition to, ERISA's remedial scheme. See, *e. g., Pilot Life, supra*, at 54 (citing *Russell, supra*, at 146); *Harris Trust, supra*, at 99 (citing *Silkwood, supra*, at 248).

## III

The question for the Court, therefore, is whether § 4–10 provides such a vehicle. Without question, Moran had a "panoply of remedial devices," *Russell, supra*, at 146, available under § 502 of ERISA when petitioner denied her claim for benefits.[5] Section 502(a)(1)(B) of ERISA provided the most obvious remedy: a civil suit to recover benefits due under the terms of the plan. 29 U. S. C. § 1132(a)(1)(B). But rather than bring such a suit, Moran sought to have her right to benefits determined outside of ERISA's remedial scheme through the arbitral-like mechanism available under § 4–10.

Section 4–10 cannot be characterized as anything other than an alternative state-law remedy or vehicle for seeking benefits. In the first place, § 4–10 comes into play only if the HMO and the claimant dispute the claimant's entitlement to benefits; the purpose of the review is to determine whether a claimant is entitled to benefits. Contrary to the majority's characterization of § 4–10 as nothing more than a state law

---

[5] Commonly included in the panoply constituting part of this enforcement scheme are: suits under § 502(a)(1)(B) (authorizing an action to recover benefits, obtain a declaratory judgment that one is entitled to benefits, and to enjoin an improper refusal to pay benefits); suits under §§ 502(a)(2) and 409 (authorizing suit to seek removal of the fiduciary); and a claim for attorney's fees under § 502(g). See *Russell*, 473 U. S., at 146–147; *Pilot Life Ins. Co. v. Dedeaux*, 481 U. S. 41, 53 (1987).

regarding medical standards, *ante*, at 383–384, it is in fact a binding determination of whether benefits are due: "In the event that the reviewing physician determines the covered service to be medically necessary, the [HMO] *shall provide* the covered service." 215 Ill. Comp. Stat., ch. 125, § 4–10 (2000) (emphasis added). Section 4–10 is thus most precisely characterized as an arbitration-like mechanism to settle benefits disputes. See Brief for United States as *Amicus Curiae* 23 (conceding as much).

There is no question that arbitration constitutes an alternative remedy to litigation. See, *e. g., Air Line Pilots* v. *Miller*, 523 U. S. 866, 876, 880 (1998) (referring to "arbitral remedy" and "arbitration remedy"); *DelCostello* v. *Teamsters*, 462 U. S. 151, 163 (1983) (referring to "arbitration remedies"); *Great American Fed. Sav. & Loan Assn.* v. *Novotny*, 442 U. S. 366, 377–378 (1979) (noting that arbitration and litigation are "alternative remedies"); 3 D. Dobbs, Law of Remedies § 12.23 (2d ed. 1993) (explaining that arbitration "is itself a remedy"). Consequently, although a contractual agreement to arbitrate—which does not constitute a "State law" relating to "any employee benefit plan"—is outside § 514(a) of ERISA's pre-emptive scope, States may not circumvent ERISA pre-emption by mandating an alternative arbitral-like remedy as a plan term enforceable through an ERISA action.

To be sure, the majority is correct that § 4–10 does not mirror all procedural and evidentiary aspects of "common arbitration." *Ante*, at 381–383. But as a binding decision on the merits of the controversy the § 4–10 review resembles nothing so closely as arbitration. See generally 1 I. MacNeil, R. Spediel, & T. Stipanowich, Federal Arbitration Law § 2.1.1 (1995). That the decision of the § 4–10 medical reviewer is ultimately enforceable through a suit under § 502(a) of ERISA further supports the proposition that it tracks the arbitral remedy. Like the decision of any arbitrator, it is enforceable through a subsequent judicial action, but judicial

review of an arbitration award is very limited, as was the Court of Appeals' review in this case. See, *e. g., Paperworkers* v. *Misco, Inc.*, 484 U. S. 29, 36–37 (1987) (quoting *Steelworkers* v. *American Mfg. Co.*, 363 U. S. 564, 567–568 (1960)). Although the Court of Appeals recharacterized Moran's claim for reimbursement under § 4–10 as a claim for benefits under § 502(a)(1)(B) of ERISA, the Court of Appeals did not interpret the plan terms or purport to analyze whether the plan fiduciary had engaged in the "full and fair review" of Moran's claim for benefits that § 503(2) of ERISA, 29 U. S. C. § 1133(2), requires. Rather, it rubberstamped the independent medical reviewer's judgment that Moran's surgery was "medically necessary," granting summary judgment to Moran on her claim for benefits solely on that basis. Thus, as Judge Posner aptly noted in his dissent from the denial of rehearing en banc below, § 4–10 "establishes a system of appellate review of benefits decisions that is distinct from the provision in ERISA for suits in federal court to enforce entitlements conferred by ERISA plans." 230 F. 3d, at 973.

## IV

The Court of Appeals attempted to evade the pre-emptive force of ERISA's exclusive remedial scheme primarily by characterizing the alternative enforcement mechanism created by § 4–10 as a "contract term" under state law.[6] *Id.*, at 972. The Court saves § 4–10 from pre-emption in a somewhat different manner, distinguishing it from an alternative enforcement mechanism because it does not "enlarge the

---

[6] The Court of Appeals concluded that § 4–10 is saved from pre-emption because it is a law that "regulates insurance," and that it does not conflict with the exclusive enforcement mechanism of § 502 because § 4–10's independent review mechanism is a state-mandated contractual term of the sort that survived ERISA pre-emption in *UNUM Life Ins. Co. of America* v. *Ward*, 526 U. S. 358, 375–376 (1999). In the Court of Appeals' view, the independent review provision, like any other mandatory contract term, can be enforced through an action brought under § 502(a) of ERISA, 29 U. S. C. § 1132(a), pursuant to state law. 230 F. 3d, at 972.

claim beyond the benefits available in any action brought under § 1132(a)," and characterizing it as "something akin to a mandate for second-opinion practice in order to ensure sound medical judgments." *Ante,* at 379–380, 384. Neither approach is sound.

The Court of Appeals' approach assumes that a State may impose an alternative enforcement mechanism through mandated contract terms even though it could not otherwise impose such an enforcement mechanism on a health plan governed by ERISA. No party cites any authority for that novel proposition, and I am aware of none. Cf. *Fort Halifax Packing Co.* v. *Coyne,* 482 U. S. 1, 16–17 (1987) (noting that a State cannot avoid ERISA pre-emption on the ground that its regulation only mandates a benefit plan; such an approach would "permit States to circumvent ERISA's pre-emption provision, by allowing them to require directly what they are forbidden to regulate"). To hold otherwise would be to eviscerate ERISA's comprehensive and exclusive remedial scheme because a claim to benefits under an employee benefits plan could be determined under each State's particular remedial devices so long as they were made contract terms. Such formalist tricks cannot be sufficient to bypass ERISA's exclusive remedies; we should not interpret ERISA in such a way as to destroy it.

With respect to the Court's position, Congress' intention that § 502(a) be the exclusive remedy for rights guaranteed under ERISA has informed this Court's weighing of the pre-emption and saving clauses. While the Court has previously focused on ERISA's *overall* enforcement mechanism and remedial scheme, see *infra,* at 393–394, the Court today ignores the "interlocking, interrelated, and interdependent" nature of that remedial scheme and announces that the relevant inquiry is whether a state regulatory scheme "provides [a] new cause of action" or authorizes a "new form of ultimate relief." *Ante,* at 379. These newly created principles have no roots in the precedents of this Court. That § 4–10 *also*

effectively provides for a second opinion to better ensure sound medical practice is simply irrelevant to the question whether it, in fact, provides a binding mechanism for a participant or beneficiary to pursue a claim for benefits because it is on this latter basis that § 4–10 is pre-empted.

The Court's attempt to diminish § 4–10's effect by characterizing it as one where "the reviewer's determination would *presumably* replace that of the HMO," *ante,* at 380 (emphasis added), is puzzling given that the statute makes such a determination conclusive and the Court of Appeals treated it as a binding adjudication. For these same reasons, it is troubling that the Court views the review under § 4–10 as nothing more than a practice "of obtaining a second [medical] opinion." *Ante,* at 383. The independent reviewer may, like most arbitrators, possess special expertise or knowledge in the area subject to arbitration. But while a second medical opinion is nothing more than that—an opinion—a determination under § 4–10 is a conclusive determination with respect to the award of benefits. And the Court's reference to *Pegram* v. *Herdrich,* 530 U. S. 211 (2000), as support for its Alice in Wonderland-like claim that the § 4–10 proceeding is "far removed from any notion of an enforcement scheme," *ante,* at 383, is equally perplexing, given that the treatment is long over and the issue presented is purely an eligibility decision with respect to reimbursement.[7]

---

[7] I also disagree with the Court's suggestion that, following *Pegram* v. *Herdrich,* 530 U. S. 211 (2000), HMOs are exempted from ERISA whenever a coverage or reimbursement decision relies in any respect on medical judgment. *Ante,* at 383, 386, n. 17. *Pegram* decided the limited question whether relief was available under § 1109 for claims of fiduciary breach against HMOs based on its physicians' medical decisions. Quite sensibly, in my view, that question was answered in the negative because otherwise, "for all practical purposes, every claim of fiduciary breach by an HMO physician making a mixed decision would boil down to a malpractice claim, and the fiduciary standard would be nothing but the malpractice standard traditionally applied in actions against physicians." 530 U. S., at 235.

As we held in *Metropolitan Life Ins. Co.* v. *Massachusetts*, 471 U. S. 724 (1985), a State may, of course, require that employee health plans provide certain substantive benefits. See *id.*, at 746 (holding that a state law mandating mental health benefits was not within ERISA's pre-emptive reach). Indeed, were a State to require that insurance companies provide all "medically necessary care" or even that it must provide a second opinion before denying benefits, I have little doubt that such *substantive* requirements would withstand ERISA's pre-emptive force. But recourse to those benefits, like all others, could be sought only through an action under § 502 and not, as is the case here, through an arbitration-like remedial device. Section 4–10 does not, in any event, purport to extend a new substantive benefit. Rather, it merely sets up a procedure to conclusively determine whether the HMO's decision to deny benefits was correct when the parties disagree, a task that lies within the exclusive province of the courts through an action under § 502(a).

By contrast, a state law regulating insurance that merely affects whether a plan participant or beneficiary may *pursue* the remedies available under ERISA's remedial scheme, such as California's notice-prejudice rule, is not pre-empted because it has nothing to do with § 502(a)'s exclusive enforcement scheme. In *UNUM Life Ins. Co. of America* v. *Ward*, 526 U. S. 358 (1999), the Court evaluated California's so-called notice-prejudice rule, which provides that an insurer cannot avoid liability in cases where a claim is not filed in a timely fashion absent proof that the insurer was actually prejudiced because of the delay. In holding that it was not pre-empted, the Court did not suggest that this rule provided a substantive plan term. The Court expressly declined to address the Solicitor General's argument that the saving clause saves even state law "conferring causes of action or affecting remedies that regulate insurance." See *id.*, at 376–377, n. 7 (internal quotation marks omitted). While

a law may "effectively creat[e] a mandatory contract term," *id.*, at 374 (internal quotation marks omitted), and even provide the rule of decision with respect to whether a claim is *out of time,* and thus whether benefits will ultimately be received, such laws do not create an *alternative enforcement mechanism* with respect to recovery of plan benefits. They merely allow the participant to proceed via ERISA's enforcement scheme. To my mind, neither *Metropolitan Life* nor *UNUM* addresses, let alone purports to answer, the question before us today.

\* \* \*

Section 4–10 constitutes an arbitral-like state remedy through which plan members may seek to resolve conclusively a disputed right to benefits. Some 40 other States have similar laws, though these vary as to applicability, procedures, standards, deadlines, and consequences of independent review. See Brief for Respondent State of Illinois 12, n. 4 (citing state independent review statutes); see also Kaiser Family Foundation, K. Politz, J. Crowley, K. Lucia, & E. Bangit, Assessing State External Review Programs and the Effects of Pending Federal Patients' Rights Legislation (May 2002) (comparing state program features). Allowing disparate state laws that provide inconsistent external review requirements to govern a participant's or beneficiary's claim to benefits under an employee benefit plan is wholly destructive of Congress' expressly stated goal of uniformity in this area. Moreover, it is inimical to a scheme for furthering and protecting the "careful balancing of the need for prompt and fair claims settlement procedures against the public interest in encouraging the formation of employee benefit plans," given that the development of a federal common law under ERISA-regulated plans has consistently been deemed central to that balance.[8] *Pilot Life,* 481 U. S., at 54, 56. While

---

[8] The Court suggests that a state law's impact on cost is not relevant after *New York State Conference of Blue Cross & Blue Shield Plans*

it is true that disuniformity is the inevitable result of the congressional decision to save local insurance regulation, this does not answer the altogether different question before the Court today, which is whether a state law "regulating insurance" nonetheless provides a separate vehicle to assert a claim for benefits outside of, or in addition to, ERISA's remedial scheme. See, e. g., id., at 54 (citing *Russell*, 473 U. S., at 146); *Harris Trust*, 510 U. S., at 99 (citing *Silkwood*, 464 U. S., at 248). If it does, the exclusivity and uniformity of ERISA's enforcement scheme must remain paramount and the state law is pre-empted in accordance with ordinary principles of conflict pre-emption.[9]

---

v. *Travelers Ins. Co.*, 514 U. S. 645, 662 (1995), which holds that a state law providing for surcharges on hospital rates did not, based solely on their indirect economic effect, "bear the requisite 'connection with' ERISA plans to trigger pre-emption." But *Travelers* addressed only the question whether a state law "relates to" an ERISA plan so as to fall within § 514(a)'s broad pre-emptive scope in the first place and is not relevant to the inquiry here. The Court holds that "[i]t is beyond serious dispute," *ante*, at 365, that § 4–10 does "relate to" an ERISA plan; § 4–10's economic effects are necessarily relevant to the extent that they upset the object of § 1132(a). See *Ingersoll-Rand Co.* v. *McClendon*, 498 U. S. 133, 142 (1990) ("Section 514(a) was intended to ensure that plans and plan sponsors would be subject to a uniform body of benefits law; the goal was to minimize the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government. Otherwise, the inefficiencies created could work to the detriment of plan beneficiaries").

[9] The Court isolates the "plan" from the HMO and then concludes that the independent review provision does not "threaten the object of 29 U. S. C. § 1132" because it does not affect the plan, but only the HMO. *Ante*, at 381, n. 11. To my knowledge such a distinction is novel. Cf. *Pegram*, 530 U. S., at 223 (recognizing that the agreement between an HMO and an employer may provide elements of a plan by setting out the rules under which care is provided). Its application is particularly novel here, where the Court appears to view the HMO as the plan administrator, leaving one to wonder how the myriad state independent review procedures can help but have an impact on plan administration. *Ante*, at 363, n. 3.

For the reasons noted by the Court, independent review provisions may sound very appealing. Efforts to expand the variety of remedies available to aggrieved beneficiaries beyond those set forth in ERISA are obviously designed to increase the chances that patients will be able to receive treatments they desire, and most of us are naturally sympathetic to those suffering from illness who seek further options. Nevertheless, the Court would do well to remember that no employer is required to provide any health benefit plan under ERISA and that the entire advent of managed care, and the genesis of HMOs, stemmed from spiraling health costs. To the extent that independent review provisions such as § 4–10 make it more likely that HMOs will have to subsidize beneficiaries' treatments of choice, they undermine the ability of HMOs to control costs, which, in turn, undermines the ability of employers to provide health care coverage for employees.

As a consequence, independent review provisions could create a disincentive to the formation of employee health benefit plans, a problem that Congress addressed by making ERISA's remedial scheme exclusive and uniform. While it may well be the case that the advantages of allowing States to implement independent review requirements as a supplement to the remedies currently provided under ERISA outweigh this drawback, this is a judgment that, pursuant to ERISA, must be made by Congress. I respectfully dissent.