**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**August 24, 2006**

**Charles R. Fulbruge III**
**Clerk**

UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 05-20195

WILLIAM H. PEACE,

Plaintiff-Appellant,

v.

AMERICAN GENERAL LIFE INSURANCE COMPANY, ET AL,

Defendants,

HALLIBURTON COMPANY,

Defendant-Appellee.

Appeal from the United States District Court
for the Southern District of Texas

Before GARWOOD, BENAVIDES, and OWEN, Circuit Judges.

BENAVIDES, Circuit Judge:

Appellant William H. Peace, a citizen of the United Kingdom, appeals the district court's denial of his summary judgment motion and grant of Appellee Halliburton Company's ("Halliburton") summary judgment motion. The court held that Peace's breach of contract claim was preempted by the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA"). It treated that claim as a nonpayment of benefits under ERISA. We disagree and hold that

Peace's claim is not preempted by ERISA.  For the reasons set forth below, we vacate the district court's judgment and remand the case.

## I.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On January 12, 2004, Peace sued Halliburton and American General Life Insurance Company ("American General") in the state district court of Harris County, Texas for breach of contract.[1] Halliburton subsequently removed the case to the United States District Court for the Southern District of Texas.  On November 29, 2004, Peace and Halliburton filed motions for summary judgment. The district court granted Halliburton's and denied Peace's motions for summary judgment.  Peace timely appeals.

In 1984, Peace was the general manager of the Westinghouse synthetic fuels division.  At that time, Kellogg Rust, Inc. ("Kellogg Rust"), a predecessor in interest of Halliburton, purchased Westinghouse's synthetic fuels division.  Peace alleges that Kellogg Rust induced him to remain with the division by agreeing "to purchase an annuity to replace the pension amount" he would lose by leaving Westinghouse.  Kellogg Rust purchased a joint, single-premium annuity from American General and retained ownership of the annuity until 1987 when ownership was transferred to Peace.  Peace claims he was promised a monthly amount of $1155 when he became age sixty-five.  Allegedly relying on this

[1] Peace voluntarily dismissed his claim against American General.

agreement, he stayed on as general manager and became vice-president of the division. He attained the age of sixty-five in August 2003. Peace has requested that his monthly payments begin but has not received any money.

The district court held that the annuity was an employee benefit plan under ERISA. Looking to whether a plan existed, the court applied the Supreme Court's ongoing administrative scheme test and concluded that such an administrative scheme existed. *See Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1 (1987). The court noted that Halliburton (1) considered the type of investment vehicle to utilize; (2) calculated the amount to invest; (3) perused the market; (4) purchased the annuity; (5) monitored the annuity value;[2] and (6) eventually would have had to make regular payments. The court concluded that these activities constituted an administrative scheme on the part of Halliburton in providing the annuity benefit. Looking to the same facts, we come to the opposite conclusion. We hold that no administrative scheme existed, and therefore Peace's claims are not preempted by ERISA.

## II.   STANDARD OF REVIEW

---

[2] The district court does not explain how or when Halliburton monitored the annuity value. It merely cites the annuity contract. Because Halliburton, on appeal, does not claim that it monitored the annuity value and it does not offer evidence of any monitoring, we do not consider this particular activity.

3

This Court reviews summary judgments *de novo* in ERISA cases, applying the same standards as a district court. *See Baker v. Metropolitan Life Ins.*, 364 F.3d 624, 627–28 (5th Cir. 2004).

III. DISCUSSION

Under ERISA, the terms "'employee pension benefit plan' and 'pension plan' mean any plan, fund, or program which was . . . established or maintained by an employer [that provides] retirement income to employees." 29 U.S.C. § 1002(2)(A). We utilize the three-factor test set out in *Meredith v. Time Ins.*, 980 F.2d 352, 355 (5th Cir. 1993), for determining whether an employee benefit arrangement is an ERISA plan.[3] We consider whether: (1) the plan exists; (2) the plan falls within the safe-harbor provision established by the Department of Labor; and (3) the employer established or maintained the plan with the intent to benefit

---

[3] Citing *Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*, 541 U.S. 1, 20–21 (2004), the dissent argues that we also should consider an ERISA regulation—29 C.F.R. § 2510.3-3(a) (2003)—to determine whether a benefit plan was created by Halliburton, an argument not presented by Halliburton. The majority does not quarrel that an applicable Department of Labor advisory opinion (or regulation) merits consideration and deference. This regulatory provision describes certain circumstances in which a benefit guaranteed by an insurance contract or certificate is no longer a plan. This list of scenarios, however, does not represent an exhaustive list of contexts in which there is no longer a plan. Moreover, the inquiry is not when a plan ended. Instead, we must decide whether any plan existed at all. To make this determination, we follow the clear standards set forth by this Court and the Supreme Court and advanced by the parties to this appeal.

4

employees. *Id*. at 355. "If any part of the inquiry is answered in the negative, the submission is not an ERISA plan." *Id*. Here, we do not proceed further than the first inquiry because we conclude that no plan existed.

A.   Requirement of an Ongoing Administrative Scheme to Effectuate a Benefit Plan

An employee benefit encapsulated in an ERISA plan differs from a stand-alone employee benefit. The Supreme Court created the distinction between mere stand-alone benefits and full-fledged plans after examining the purpose of ERISA. *See Fort Halifax*, 482 U.S. at 9, 11–12. According to the Court, Congress implicitly recognized that an employer must "establish a uniform administrative scheme" to effectuate a "host of [employee benefit] obligations." *Id*. at 9. ERISA enables an employer to establish and maintain one scheme instead of developing numerous systems, each congruent with individual state regulations. *See id*. at 9, 11. Given that purpose, the Court concluded that only when there is an "ongoing administrative program to meet the employer's obligation" does a plan exist under ERISA. *Id*. at 11. Where no such administrative scheme exists, preemption is nonsensical because there would be nothing to regulate. *See id*. at 16.

B.   No Ongoing Administrative Scheme

Following *Fort Halifax*, we consider whether Halliburton was engaged in an ongoing administrative scheme to determine whether a

5

plan existed.[4] *See, e.g.*, *Fontenot v. NL Industries*, 953 F.2d 960 (5th Cir. 1992). As evidence of ongoing administrative activities, Halliburton states that it: (1) chose a funding mechanism, (2) calculated the required contributions to the annuity, (3) shopped for and purchased the annuity, and (4) ensured the eventual payment of benefits. The first three activities all took place before or at the time of purchase. They were not continually choosing a funding mechanism, calculating required contributions or shopping for and purchasing the annuity. Moreover, Halliburton's discretionary decision-making process for choosing a funding mechanism "has nothing to do with how the 'plan' is administered once the company decides to put it in place." *Nelson v. GMC*, 1998 U.S. App. LEXIS 15401 (6th Cir. July 7, 1998) (unpublished).[5] Similarly, the fourth activity was executed only if payment was triggered—i.e., Peace turned sixty-five. Each of these activities was performed only once or over a brief period of time and never performed again. Therefore, these were not part of an ongoing

---

[4] Halliburton appears to question whether *Fort Halifax* applies in a nonseverance benefit context. Halliburton's concern is unfounded. *Fort Halifax* has guided courts in cases involving nonseverance benefits. *See, e.g.*, *Williams v. Wright*, 927 F.2d 1540, 1545 (11th Cir. 1991) (using *Fort Halifax* to assess whether a retirement and fringe benefits agreement was a plan).

[5] The Sixth Circuit issued its affirmance without its reasoning in a published decision. *See Nelson v. GMC*, 156 F.3d 1231 (6th Cir. 1998).

6

administrative scheme.[6]

The lack of ongoing administrative activity makes this single-premium annuity benefit akin to a one-time severance benefit. This Court has held that one-time severance payments do not constitute an employee benefit plan under ERISA. *See, e.g.*, *Wells v. General Motors Corp.*, 881 F.2d 166, 176 (5th Cir. 1989) (holding that one-time lump payment was not a plan even where employees could elect a two-year installment payment option). We have concluded that a one-time lump sum payment, contingent upon an event that may never materialize, "create[s] no need for an on-going administrative program to process claims and pay benefits" and therefore is not a plan. *Fontenot*, 953 F.2d at 961. In this case, Halliburton made a one-time payment into an annuity, after which there was no subsequent demand on its assets. *Cf. Cassidy v. Akzo Nobel Salt*, Inc., 308 F.3d 613, 616 (6th Cir. 2002) (holding that a plan may be an ERISA plan if the delivery of its benefits creates an on-going demand on the employer's assets). The eventual payment of the benefit was contingent upon Peace reaching the age of sixty-five-years-old, an event which may not have materialized. *See Fontenot*,

---

[6] Halliburton fails to allege any additional responsibilities with respect to the annuity. *See, e.g.*, *Schonholz v. Long Island Jewish Medical Ctr.*, 87 F.3d 72, 76 (2d Cir. 1996) (citing *Bogue v. Ampex Corp.*, 976 F.2d 1319, 1323 (9th Cir. 1992)) (stating that whether the "obligation require[d] managerial discretion in its administration" is a factor for the court's review when determining which undertakings are complex enough to require an ongoing administrative program).

953 F.2d at 961.

This case most closely resembles *Tinoco v. Marine Chartering Co.*, 311 F.3d 617 (5th Cir. 2002). In *Tinoco*, the company established a health care benefit for employees who elected to voluntarily retire early. *Id*. at 618. Subsequently, the company was sold, and some employees received the benefit as a severance benefit. *Id*. at 619. Notably, the benefit was available either as a lump-sum payment or a "stream of payments." *Id*. at 622. The *Tinoco* Court held that the pre-determined benefit, even when paid over time, did not amount to an administrative scheme. *Id*. Here, Halliburton purchased a single-premium annuity, which guaranteed a pre-determined amount after a certain number of years, and it made no additional payments on the annuity. If the trigger event materialized, the benefit was to be paid out by American General (not Halliburton) on a monthly basis. *See Fort Halifax*, 482 U.S. at 12 ("To do little more than write a check hardly constitutes the operation of a benefit plan.") In short, the theoretical possibility that Halliburton would "ensure" that American General sent checks each month from the monies accrued on a single-premium annuity does not require the creation of an ongoing administrative program.[7]

_____

[7] The only noteworthy difference between *Tinoco* and the instant case is that Halliburton made its one-time payment to a third party which then would make regular payments to Peace. Whereas, the employer in *Tinoco* made a one-time payment or a series of payments directly to the employees. That said, this

Halliburton argues that, as owner of the annuity for a brief period of time, it *could* have made various discretionary decisions. However, it is insufficient to provide a benefit and then create an unnecessary administrative scheme around it to invoke ERISA. The Supreme Court clearly has stated that a "need" for such scheme must be created. *See Fort Halifax*, 482 U.S. at 11–12 (stating that the legislative concern for regulatory uniformity "only arises . . . with respect to benefits whose provision by nature *requires* an ongoing administrative program . . . . [A] one-time obligation in the future simply creates no *need* for an ongoing administrative program . . . .") (emphasis added). Halliburton was not required to create an administrative scheme to provide the annuity benefit. *See Tinoco*, 311 F.3d at 622 ("Appellees provide no evidence that the [plan] *requires* an administrative scheme to make ongoing discretionary decisions based on subjective criteria.") (emphasis added). Therefore, the fact that Halliburton could have developed an unnecessary administrative scheme or performed unnecessary, ongoing administrative tasks is irrelevant to our analysis.

Finally, Halliburton, in a footnote, states that its "alleged

difference is not material. Here, whether the employee received the payment directly and when the payment was made in connection to the provision of the benefit are not two inquiries that impact this Court's determination. For example, Halliburton, like the Marine Chartering Company in *Tinoco*, could have agreed to provide Peace with a lump sum payment (or payments over time) instead of purchasing an annuity long before the trigger event. Either way, we would examine whether an ongoing administrative scheme existed to provide the payment(s).

agreement to provide Peace . . . with deferred compensation in the form of a single premium annuity qualifies as a 'top hat' plan under ERISA," citing 29 U.S.C. § 1101(a)(1).  We decline to address Halliburton's assertion because it is inadequately briefed; Halliburton fails to explain how the annuity qualifies as a "top hat" plan.  *See Peavy v. WFAA-TV*, 221 F.3d 158, 176 (5th Cir. 2000) ("This issue, raised in a footnote, is *not* adequately briefed.") (emphasis in original).

ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan."  29 U.S.C. § 1144(a) (2000).  Here, we have determined that no employee benefit plan is at issue.  Therefore, Peace's benefit claim is not governed by ERISA.  *See Tinoco*, 311 F.3d at 623.[8]

## IV.   CONCLUSION

The district court erred in holding that a plan existed for purposes of ERISA.  Halliburton has failed to offer evidence of an ongoing administrative scheme to effectuate the annuity benefit. Therefore, no employee benefit plan exists.  Accordingly, Peace's

---

[8] Because the court concluded that Peace's claim was preempted by ERISA, it only performed the statute of limitations analysis within the context of an ERISA claim.  The court did not address the statute of limitations for a breach of contract claim.  The date of the action's accrual may vary depending on the type of limitations analysis being performed. Therefore, we vacate and remand the statute of limitations question for further consideration in light of this opinion.

10

claims are not preempted by ERISA.

The district court's judgment is VACATED, and the case is REMANDED for further proceedings.

OWEN, Circuit Judge, dissenting:

Through this suit Peace is seeking to obtain or enforce pension benefits. He asserts that his agreement with Kellogg Rust entitled him to an annuity under which he would receive monthly payments from the date he reached age 65 until his death. Ongoing obligations of this sort require administration. His contention, and the majority's conclusion, that they do not is inherently inconsistent.

The district court wrote a detailed, thoughtful Memorandum and Order in this case that correctly applies the law to the facts on which William Peace relies. The district court concluded that Kellogg Rust's obligations to Peace and another, similarly-situated executive constituted an ERISA pension plan, the plan was terminated as to Peace when Kellogg Rust transferred ownership of the annuity at issue to Peace in 1987, and Peace's claims against Halliburton are barred by limitations. I would affirm the district court. I therefore respectfully dissent.

**I**

Halliburton, which is Kellogg Rust's successor, and Peace both moved for summary judgment, and the district court rendered judgment in favor of Halliburton. Considering the evidence in the light most favorable to Peace, as we must, the record reflects that at the time Kellogg Rust acquired Westinghouse Electric Corporation's synthetic fuels division in 1984, Peace asked that his yet-to-vest executive pension supplement, called the Supplemental Employee

Retirement Plan (SERP) under Westinghouse's pension plan, be replaced in exchange for his agreement to leave Westinghouse and become an employee of the Kellogg Rust affiliate, KRW Energy Systems, that would operate the former Westinghouse facility. Another Westinghouse executive made the same request. At the time, Peace was 46 years old, and he told representatives of Kellogg Rust, including Frank Shipman, that if he remained at Westinghouse another 19 years, he could retire at age 65, and the Westinghouse SERP would pay him $1,155 per month for the rest of his life. Peace wanted the equivalent of this SERP benefit irrespective of how long he remained in the employ of KRW Energy Systems. Frank Shipman's affidavit reflects that Kellogg Rust promised to replace the equivalent value of the Westinghouse SERP, and Peace's deposition testimony reflects that Frank Shipman "promised me that Kellogg would make up the executive pension supplement that I'd be losing with Westinghouse." There was no discussion of an annuity or how the Westinghouse SERP would be "ma[d]e up" or funded at that time. No specifics were discussed, and nothing was committed to writing.

With these oral assurances in hand, Peace left Westinghouse and became a Kellogg Rust employee in April or May of 1984. Thereafter, on more than one occasion, he reminded Dave Bartlett, a representative of Kellogg Rust, about the negotiations regarding the replacement of the Westinghouse SERP and was assured it would be "taken care of." In July 1985, Kellogg Rust's supervisor of pension administration sent Peace a letter enclosing an application for an annuity from American General Life Insurance Company and asking Peace and his wife to complete and return the American General application, which they did. Also enclosed with the annuity application was a piece of paper with the following typed on it:

The purpose of this application is to provide advance funding for a joint annuity on

the lives of W.H. Peace, III and spouse.

The annuity would become payable at Mr. Peace's retirement at age 65. The annuity amount of $1155 monthly will reduce to 50% of that joint amount upon the death of either joint annuitant.

All values cease upon the death of the last surviving annuitant. The ownership and control of all annuity values prior to the retirement age 65 are vested in Kellogg Rust, Inc.

Please enter correct names, state of birth, date of birth, and Social Security numbers under "A" and "B" at top of form and sign accordingly at bottom.

PRESS FIRMLY WITH BALL POINT

The parties agree that the foregoing was written by American General. Although it is fair to infer from this one-page description that the annuity would provide income of $1,155 per month when Peace attained age 65, the actual terms of the annuity did not so provide. At the time the annuity was issued, on July 31, 1985, it guaranteed only "monthly income for life with payment guaranteed for 10 years" at $216.43 per month, and the annuity guaranteed a maturity value of only $34,353.53, based on a guaranteed interest rate of 11% for the first year, but only 4% thereafter. The annuity provided that the "guaranteed benefits will be increased by interest which we may credit to the contract in excess of 4%." Kellogg paid a one-time premium of $15,888.45 to purchase this annuity. Peace did not, however, receive this information about the annuity when he completed the application. On same day American General issued the annuity covering Peace, it issued a single-premium annuity to Peace's coworker who had also left Westinghouse to join the KRW Energy Systems management team. Kellogg Rust paid $25,445.51 for that annuity.

Kellogg Rust was the owner of the annuity it purchased for Peace. Peace and his then-

14

spouse were the beneficiaries. Kellogg Rust had the right under the terms of the annuity to change the beneficiaries or cash in the annuity at any time. Peace had no vested rights in the annuity.

By September 1986, a little more than a year after the annuities were purchased for Peace and his co-worker and less than three years after Peace had left Westinghouse to work for KRW Energy Systems, Peace decided to leave KRW for other employment. As he was preparing to leave, Peace had heard from other employees that Kellogg Rust was not going to provide him with the pension supplement replacement. He wrote a memo to Dave Bartlett on KRW Energy Systems letterhead that said, among other things,

> I recall specifically a conversation I had with you in which you told me that Kellogg had decided to purchase a paid up annuity and would take a chance that I might later leave Kellogg. I want to be very clear about this: at no time was the purchase of the annuity conditioned on my continued employment with Kellogg; in fact, the purchase specifically contemplated that I might leave Kellogg.

> I fully expect to be given custody of the annuity. (I have no problem with Kellogg benefitting from interim "holding of the equity" as long as I have an unconditional claim on the pension at age 65.) If this is not acceptable to Kellogg, I intend to litigate.

Peace terminated his employment with KRW in September 1986. One month later, Peace received a letter from American General notifying him of a change in the annuity's interest rate for the next year to 10%. The letter also informed Peace that the new interest rate would be guaranteed for twelve months and that the then-present value of the annuity was $17,636.18.

In April 1987, Kellogg Rust asked American General to reissue the annuity certificate in Peace's name. In September 1987, a year after Peace had written the memo to Dave Bartlett demanding "custody" of the annuity, American General wrote a letter to Peace that said, "We

15

acknowledge the receipt of your request for a change of ownership and duplicate policy on the above policy. We have changed the ownership designation on the above referenced policy and an endorsed copy of the recorded change form is enclosed." On the same date, American General sent an endorsement to Peace that reflected the ownership of the annuity had been changed to Peace, and American General sent a Certificate of Lost Policy. A "Contract Information" sheet, which Peace says he may have received at the same time but cannot remember, reflects the that the "guaranteed monthly annuity benefit" was only $216.43. An affidavit from the custodian of American General's records states that its records reflect that this "Contract Information" sheet was attached to the Certificate of Lost Policy that was sent to Peace in September 1987.

At least from 1993 through 2001, Peace received information about his annuity from American General each year. He may have received statements from 1988 through 1993. However, he had moved to England and does not remember whether he received the annual information for those years. The statements he admits receiving reflected the total "contract value" and the interest rate for each year. Peace acknowledged in his deposition that he reviewed the statements as they arrived, including the 1986 statement, and testified, "I do recall being somewhat concerned about the annuity value." The amount of the annuity "looked a little low to me." The 1993 statement, which Peace received, reflects the value of the annuity was $30,852.84 at that point in time and that the twelve-month interest rate was 5.75%.

When he reached age 65 in 2003, Peace requested that American General pay him $1,155 per month. He was concerned about the value of the annuity and its adequacy to fund $1,155 per month for the remainder of his life, but Peace testified in his deposition that he assumed that his "contract . . . with M. W. Kellogg," the parent company of Kellogg Rust, "had been passed

16

through to American General." Peace's request for $1,155 a month was not honored by American General, and he sued that company and Halliburton, as Kellogg Rust's successor, in 2004.

American General is no longer a party to these proceedings. The other former Westinghouse executive who became a KRW Energy employee and received an annuity from Kellogg Rust exercised one of several options under his annuity and received a lump sum payment of $55,256.78 in August 1995. He has not sued Halliburton or American General.

## II

### A

Peace's characterization of his agreement with Kellogg Rust has been mercurial. In his complaint, he alleged, "To induce Peace to stay with the business and become a KRW Energy Systems employee, Kellogg Rust, Inc. agreed to purchase an annuity to replace the pension amount that Peace lost by leaving Westinghouse." The evidence is undisputed that the purchase of an annuity was not discussed until after Peace had left Westinghouse and was already a KRW employee, but the evidence does reflect that thereafter, Kellogg decided to purchase an annuity to fund Kellogg Rust's obligations to Peace, and Peace was in accord.

After Peace's deposition had been taken in this litigation, his characterization of the agreement with Kellogg Rust changed somewhat. In a declaration prepared as part of his response to Halliburton's motion for summary judgment, Peace asserted that "To persuade me to continue to work at [the Westinghouse facility] under new ownership, Kellogg and Kellogg Rust promised, among other things, to pay me $1,155 per month, for life, beginning at age 65, to cover the feared loss of benefits under the Westinghouse Pension Plan." Halliburton moved to strike

17

this latter assertion, and the district court held "[i]t is well settled that a party cannot defeat a

motion for summary judgment or create a genuine fact issue by using an affidavit that impeaches,

without explanation, his deposition testimony."[1]

But regardless of how the agreement between Peace and Kellogg Rust is characterized, it

was a "pension plan" as defined by ERISA, 29 U.S.C. § 1002(2)(A), which provides:

> Except as provided in subparagraph (B), the terms "employee pension
> benefit plan" and "pension plan" mean any plan, fund, or program which was
> heretofore or is hereafter established or maintained by an employer or by an
> employee organization, or by both, to the extent that by its express terms or as a
> result of surrounding circumstances such plan, fund, or program –
> (i) provides retirement income to employees. . . .

To meet its obligations to Peace, Kellogg Rust maintained a plan or a fund to provide

retirement income to Peace, and ongoing administration was necessary.  The fact that Kellogg

Rust delegated administration to American General by purchasing an annuity does not take

Kellogg Rust's agreement with Peace or the annuity out of ERISA's ambit.  Employers routinely

purchase insurance to fund welfare or pension plan benefits and retain third parties to administer

employee benefit plans.[2]  Indeed, this court held in *Memorial Hospital System v. Northbrook Life*

---

[1]Memorandum and Order at 23 (citing *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996), and *Thurman v. Sears, Roebuck & Co.*, 952 F.2d 128, 137 n.23 (5th Cir. 1992)).

[2]*See* 26 U.S.C. § 412(i) (providing that a pension plan may be funded exclusively by the purchase of individual insurance contracts under certain conditions); *see generally Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 359, 374 (2002) (noting that an employee welfare benefit plan had contracted with a health maintenance organization to provide health benefits and holding that the HMO was in the insurance industry within the meaning of ERISA, 29 U.S.C. § 1144(b)(2)(A), when it served as the insurer and administrator of the plan); *FMC Corp. v. Holliday*, 498 U.S. 52, 53 (1990) (recognizing that insurance companies often act as insurers and administrators of employee welfare benefit plans and holding that employee benefit plans that are insured are subject to indirect state insurance regulation).

18

*Insurance Co.* that the purchase of an insurance policy covering a class of employees was

"'substantial evidence that a plan, fund, or program has been established,'" although it is not

conclusive evidence.[3] That case involved welfare benefits,[4] but the rationale of *Memorial*

*Hospital* applies equally to pension benefits.[5] The employer had purchased a group policy

providing life, accidental death, medical and other insurance for its employees.[6] The employer

paid one-half of the premiums; the other one-half was funded by employee contributions.[7] This

court held that the evidence "clearly show[ed] [the employer's] intent to provide its employees

with a welfare benefit program through the purchase and maintenance of a group insurance

---

[3]904 F.2d 236, 242 (5th Cir. 1990) ("'[T]he purchase of insurance does not conclusively establish a plan, fund, or program, but the purchase is evidence of the establishment of a plan, fund, or program; the purchase of a . . . policy or multiple policies covering a class of employees offers substantial evidence that a plan, fund, or program has been established.'" (quoting *Donovan v. Dillingham*, 688 F.2d 1367, 1373 (11th Cir. 1982) (en banc) (omission in original))).

[4]An employee welfare benefit plan is defined in 29 U.S.C. § 1002(1), and that section provides that such a plan, fund, or program may be provided through the purchase of insurance:

> (1) The terms "employee welfare benefit plan" and "welfare plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).

[5]*See id.* § 1002(2) (defining the terms "employee pension benefit plan" and "pension plan").

[6]*Mem'l Hosp.*, 904 F.2d at 241.

[7]*Id.*

policy."[8]  Significantly, the court held "[t]he fact that [the employer's] administrative functions under the policy are minimal is perfectly in keeping with its intent that [the insurer] administer the plan as well as insure it."[9]

In administering the obligations set forth in the annuity for Peace's benefit, American General was required to decide upon an interest rate each year, not less than 4%, and apply that rate to the initial $15,888.45 and all accrued interest.  Under the terms of the annuity, American General had some discretion as to what interest rate it would pay each year.  Once the beneficiary reached age 65, American General was required to honor the beneficiary's choice among several payment options.  (There were at least six options from which to choose, including, *inter alia* periodic payments for life, periodic joint and survivor payments, payments for a specified period, or a lump sum.)  If Peace died before all benefits were paid, American General would be required to determine if he had a surviving spouse.  If Peace had remarried since the annuity was issued, American General would be required to determine who the proper payee would be upon Peace's death.  In fact Peace divorced the woman to whom he was married when the annuity was issued and married another in 1990.  As long as there were funds to be distributed under the annuity, American General was required to invest, administer, and account for those funds and to pay them to the proper beneficiary.  These types of administrative responsibilities are no different than those regarding other pension plans.

The obligation that Kellogg Rust undertook to provide retirement income to Peace is distinctly different from the statutory obligation to make one-time payments to employees upon

---

[8]*Id.*

[9]*Id.* at 243.

termination of employment at issue in *Fort Halifax Packing Co., Inc. v. Coyne*.[10]  When the

obligation is to make "a one-time, lump-sum payment triggered by a single event . . . [t]he

employer assumes no responsibility to pay benefits on a regular basis, and thus faces no periodic

demands on its assets that create a need for financial coordination and control."[11]  That is not the

case with the plan Kellogg Rust provided for Peace and his co-worker.  Although Kellogg Rust

made one-time payments to American General, the *plan* it agreed to provide for Peace's benefit

was that American General would perform all the necessary administrative tasks and would be

responsible for financial management to insure retirement benefits would be paid to Peace each

month after he reached age 65 or to his spouse if he died, or pursuant to any of the other options

the beneficiary might choose under the annuity.  This is more than "making a single set of

payments to employees at the time the plant closes," as was the case in *Fort Halifax*.[12]

In *Fort Halifax*, the Supreme Court explained "what it is that makes a plan a plan."[13]  One

of the parties had argued that "death benefits sometimes involve a one-time payment to

beneficiaries."[14]  The Court reasoned that such a one-time obligation was a plan under ERISA

notwithstanding that only a single lump sum payment might be made:

> While death benefits may represent a one-time payment from the perspective of the
> beneficiaries, the employer clearly foresees the need to make regular payments to
> survivors on an ongoing basis.  The ongoing, predictable nature of this obligation

---

[10]482 U.S. 1 (1987).

[11]*Id*. at 12.

[12]*Id.*

[13]*Id*. at 14 n.9.

[14]*Id.*

therefore creates the need for an administrative scheme to process claims and pay out benefits, whether those benefits are received by beneficiaries in a lump sum or on a periodic basis. This is borne out by the fact that death benefits are included in appellant's retirement plan, with instructions on how eligibility is to be determined, benefit levels calculated, and disbursements made. By contrast, appellant's statutory obligation did not prompt the establishment of any payment program, since there were no ongoing benefits to be paid.[15]

The pension plans for Peace and his co-worker have the same characteristics as death benefits, even those that involve only a one-time payment.

The majority relies in part on this court's decision in *Tinoco v. Marine Chartering Co., Inc.*[16] In *Tinoco* the "Early Retiree Health Care Plan" at issue "offered Appellees the choice of a lump-sum payment or a stream of payments until they reached the age of 62."[17] This court found it significant that "[r]egardless of how Appellees chose to receive those payments, the total amount to be paid was based on a one-time calculation using a fixed formula."[18] That is not the case here. American General was to choose an interest rate each year, with a floor of 4%, and had other administrative obligations, as outlined above. The plan before us today is likewise distinguishable from certain other severance benefits this court has held were not ERISA plans because they required scant administration and no discernment by the administrator.[19]

---

[15]*Id.* (internal citation omitted).

[16]311 F.3d 617 (5th Cir. 2002).

[17]*Id.* at 618, 622.

[18]*Id.* ("Under the formula, age (which must have been a minimum of 55) is added to the number of years of service (which must have been at least 15 years). Appellees then received a percentage of what they would normally receive in Social Security based on the total number arrived at through the above calculation.").

[19]*See Fontenot v. NL Indus., Inc.*, 953 F.2d 960, 961-62 (5th Cir. 1992) (holding that a "'golden parachute'" that would pay an executive "terminated within two years of a change of

22

The agreement between Peace and Kellogg Rust was much like the agreement at issue in *Whittemore v. Schlumberger Technology Corp.*, in which we held that the "argument that the Schlumberger plan is self-executing and thus does not require 'administration' is to no avail."[20] We concluded that the severance pay in lieu of notice-of-termination provision at issue was an ERISA plan, holding "we perceive nothing about the Schlumberger plan to take it out of the ordinary definition of an ERISA plan. . . . [T]he plan plainly required some sort of an administrative set-up in order to make payments to employees."[21]

**B**

The Supreme Court's decision in *Fort Halifax* tells us that in deciding whether a state law "relate[s] to" an employee benefit plan,[22] we must consider ERISA's purposes.[23] These include "'protection afforded participants by eliminating the threat of conflicting and inconsistent State and local regulation.'"[24] Preemption of state-law claims relating to the retirement benefits

---

control . . . a lump sum cash payment of three times his highest annual compensation for the preceding three years, as well as three year continuation of certain benefits" was not an ERISA plan); *Wells v. Gen. Motors Corp.*, 881 F.2d 166, 176 (5th Cir. 1989) (holding that "a procedure by which employees could elect to receive a one-time lump payment if they ceased working at [a] plant" was not an ongoing plan "nor was there any need for continuing administration of the payment program (though employees could elect a two-year installment payment option)").

[20]976 F.2d 922, 923 (5th Cir. 1992).

[21]*Id*. (distinguishing *Fort Halifax Packing Co., Inc. v. Coyne*, 482 U.S. 1, 9 (1987), and *Wells v. Gen. Motors Corp.*, 881 F.2d 166 (5th Cir. 1989)).

[22]29 U.S.C. § 1144(a).

[23]*Fort Halifax*, 482 U.S. at 8.

[24]*Id*. at 9 (quoting Representative Dent, ERISA's House sponsor, 120 CONG. REC. 29197 (1974)).

agreement between Peace and Kellogg Rust furthers that purpose. The threat of conflicting and inconsistent state regulation existed regarding the latitude in the selection of an interest rate each year and the property rights of a spouse upon divorce or death of the annuitant. Many other state laws might apply, such as those regarding creditors' rights to pension benefits and laws that automatically revoke the designation of a spouse as beneficiary upon divorce.[25]

Permitting state law claims to be asserted with regard to the pension plan Kellogg Rust established for Peace also "implicate[s] the regulatory concerns of ERISA itself."[26] The Supreme Court explained in *Fort Halifax* that "ERISA was enacted because Congress found it desirable that 'disclosure be made and safeguards be provided with respect to the establishment, operation, and administration of [employee benefit] plans,'"[27] and that Congress intended that ERISA's "standards would safeguard employees from 'such abuses as self-dealing, imprudent investing, and misappropriation of plan funds.'"[28] The need for such regulation applies with equal force to the pension scheme at issue today. Kellogg Rust and American General, as the administrator and insurer of the plan, should not be excluded from ERISA's regulatory obligations.

If we were to credit Peace's contention that Kellogg Rust's agreement was not just to provide an annuity, but that Kellogg Rust agreed to pay him $1,155 per month from age 65 until his death, I strongly suspect that the majority would conclude that such a pension scheme is

---

[25]*See generally Egelhoff v. Egelhoff*, 532 U.S. 141 (2001).

[26]*Fort Halifax*, 482 U.S. at 15.

[27]*Id.* (quoting 29 U.S.C. § 1001(a)).

[28]*Id.* (quoting Senator Williams, ERISA's Senate sponsor, 120 CONG. REC. 29932 (1974)).

within ERISA's definition of a "pension plan."[29]  An agreement to make monthly retirement payments of a set amount requires administration as well as financial planning and management to meet that obligation.  This is the essence of any pension plan and why Congress believed ERISA, with its attendant regulations, was needed.  The fact that American General was engaged to discharge Kellogg Rust's obligations in the form of an annuity, and American General was thus the administrator and insurer of pension benefits, should not change the analysis.

The Supreme Court has said that in interpreting ERISA, the Department of Labor's views and regulations "merit[] the judiciary's respectful consideration."[30]  Regulations have been promulgated to "clarif[y]" what constitutes an "employee benefit plan" within the meaning of ERISA and to provide "a general principle which can be applied to a large class of plans" to determine if they are ERISA plans.[31]  These regulations includes a provision that describes when benefits guaranteed by an insurance contract or certificate are not an employee pension plan.[32]  It

---

[29]29 U.S.C. § 1002(2).

[30]*Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*, 541 U.S. 1, 20-21 (2004).

[31]29 C.F.R. § 2510.3-3(a) (2003).

[32]Subsection 2510.3-3(d)(2)(ii)(A) provides:

(ii)  An individual is not a participant covered under an employee pension plan or a beneficiary receiving benefits under an employee pension plan if–

(A) The entire benefit rights of the individual–

(1) Are fully guaranteed by an insurance company, insurance service or insurance organization licensed to do business in a State, and are legally enforceable by the sole choice of the individual against the insurance company, insurance service or insurance organization; and

25

follows that unless benefits provided through an insurance certificate have all the attributes set forth in this regulation, the benefits constitute an ERISA pension plan. There would be no need for this regulation if an employer could provide benefits by means of an insurance contract that did not meet this section's requirements and thereby avoid ERISA and its attendant financial and regulatory obligations. Until an employee has an enforceable right against a licensed insurance company, the employer's promise to maintain insurance to fund benefits is a hollow one, fraught with financial risk for the employee. The benefits Kellogg Rust provided to Peace in the form of an annuity owned by Kellogg Rust, in which Peace had no legally enforceable rights at his "sole choice . . . against the insurance company," did not meet the requirements of 29 C.F.R. § 2510.3-3(d)(2)(ii) until 1987, when the annuity was re-issued and Peace became the sole owner. Until that date, Kellogg Rust maintained an ERISA pension plan that covered Peace.

Peace's state-law breach-of-contract claim to recover the difference between what the annuity will pay him and what he alleges he was promised the annuity would pay him is a claim that "relate[s] to" an "employee benefit plan" within the meaning of 29 U.S.C. § 1144(a) and is preempted.[33] Peace does not argue to the contrary. He effectively concedes that if his agreement with Kellogg Rust was a pension plan, his breach of contract claim is preempted. He maintains,

---

> (2) A contract, policy or certificate describing the benefits to which the individual is entitled under the plan has been issued to the individual[.]

[33]29 U.S.C. § 1144(a) ("Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title. This section shall take effect on January 1, 1975.").

26

however, that his ERISA claims still have vitality, even though he did not file suit until 2004.

**III**

Halliburton moved for summary judgment, contending that Peace's claims are ERISA claims that are barred by limitations. The parties agree that ERISA borrows the Texas statute of limitations and that a four-year statute of limitations applies to any ERISA claims against Halliburton.[34] The majority does not reach the limitations issue because of its conclusion that all of Peace's claims are state-law breach-of-contract claims, rather than ERISA claims.

In analyzing the limitations issue, it is important to understand precisely what Peace is claiming. In his initial brief in this court, Peace asserted, "The agreement was to purchase an annuity that would pay monthly payments of $1,155 to Peace upon reaching age 65."[35] He further contended, "Halliburton could have purchased another annuity that would have fulfilled its obligation to Peace at any time before Peace turned 65 on August 14, 2003."[36] In that same brief, Peace maintained that his statement in a declaration that "'Kellogg Rust promised, among other things, to pay me $1,155 per month, for life, beginning at age 65'" is consistent with his characterization of the agreement with Kellogg Rust.[37] He explained, "Peace's deposition testimony does not say that that [sic] Halliburton agreed to replace these [Westinghouse] benefits

---

[34]*See* TEX. CIV. PRAC. & REM. CODE § 16.004(a) (2002).

[35]Brief of Plaintiff-Appellant William H. Peace at 23; *see also id.* at 24 (stating "the Peace-Halliburton agreement [was] to purchase a single-premium annuity that would pay Peace $1,155 per month when he turned 65").

[36]*Id.* at 23.

[37]*Id.* at 31.

27

with anything other than a single-premium annuity."[38]  However, in his reply brief, Peace shifted his claim somewhat, asserting for the first time in this court that his agreement can be viewed in two, alternative ways, "as an agreement to pay $1,155 per month at age 65 or an agreement to purchase an annuity paying that amount."[39]

I agree with the district court that Peace's "alternate" description of the agreement as an unconditional one to pay $1,155 per month, rather than one to purchase an annuity that would provide a benefit in that amount, is foreclosed by the evidence.  Peace viewed the annuity purchased for him as the ultimate result of his negotiations with Kellogg Rust.  By September 1987, Peace looked only to the annuity as embodying his agreement with Kellogg Rust regarding the replacement of benefits he might have received from Westinghouse.  As Peace was leaving Kellogg Rust's employ, he demanded "custody" of the annuity, nothing more.  The ownership of the annuity was transferred to him, and he made no further demand of Kellogg Rust until this suit.  Peace asked for and received "an unconditional claim" on the "paid up annuity" that "Kellogg had decided to purchase," equating it with "the Executive Pension Supplement."  The district court properly ruled that Peace's declaration, stating that Kellogg Rust had agreed to pay him $1,155 per month for the remainder of his life commencing on his 65th birthday, should not be considered as evidence of his agreement with Kellogg Rust because Peace's declaration was contrary to his deposition testimony and should be disregarded.  Peace testified during his deposition that "this annuity was meant to fund the promise of the executive supplemental pension benefit," and "when

---

[38]*Id*. at 31-32.

[39]Plaintiff-Appellant William H. Peace's Reply Brief at 1 (also stating, "In essence, it was an agreement for Kellogg Rust to pay Peace $1,155 per month when he turned 65, and Kellogg Rust told Peace that it was purchasing an annuity to pay that money").

28

[he] speak[s] of the executive supplemental pension that [he was] promised, in [his] mind that means this annuity," referencing the American General annuity. The evidence supports a claim that the annuity Kellogg Rust provided was inadequate to generate pension income of $1,155 per month, but it does not support a claim that Kellogg Rust made a free-standing promise to pay Peace $1,155 once he attained age 65.

The district court further correctly concluded that Kellogg Rust terminated its ERISA plan or fund as to Peace when it transferred ownership of the annuity to him in 1987. Peace does take issue with this holding. He does not even address it. Nor does he address the district court's holding that "when the annuity was reissued in plaintiff's name, he ceased to be a 'participant covered under an employee pension plan.'"[40] The district court cited and relied upon a provision in 29 C.F.R. § 2510.3-3(d)(2)(ii) that says:

> (ii) An individual is not a participant covered under an employee pension plan or a beneficiary receiving benefits under an employee pension plan if–
>
> (A) The entire benefit rights of the individual–
>
> > (1) Are fully guaranteed by an insurance company, insurance service or insurance organization licensed to do business in a State, and are legally enforceable by the sole choice of the individual against the insurance company, insurance service or insurance organization; and
> >
> > (2) A contract, policy or certificate describing the benefits to which the individual is entitled under the plan has been issued to the individual; or
>
> (B) The individual has received from the plan a lump-sum distribution or a series of distributions of cash or other property which represents the balance of his or her credit under the plan.[41]

---

[40]Memorandum and Order at 26.

[41]29 C.F.R. § 2510.3-3(d)(2)(ii).

Peace's benefit rights were contained solely in the annuity, and the transfer of ownership of the annuity in 1987 satisfied all the requirements of this provision. Peace's participation in Kellogg Rust's pension plan ceased in 1987. He was no longer covered under a pension plan. When Peace reached the age of 65, he had no plan from Kellogg Rust to which to look. This does not mean that Peace was without a remedy when Kellogg Rust failed to structure the pension plan as agreed.

Prior to its termination in 1987, Peace's pension plan had called for the purchase of an annuity that would provide benefits of $1,155 a month. When ownership of the annuity was transferred to Peace in 1987, he had a cause of action against Kellogg Rust for failing to provide a plan that conformed to their agreement. He could have sued under 29 U.S.C. § 1132(a)(1)(B) "to enforce his rights under the terms of the plan" or under § 1132(a)(3) "to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or . . . to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."[42] What he cannot do in 2004, seventeen years after the plan was terminated and its assets were distributed to him, is sue for benefits under that plan.

Peace argues that this court held in *Paris v. Profit Sharing Plan for Employees of Howard B. Wolf, Inc.* that "for purposes of ERISA a cause of action does not accrue until an application [for benefits] is denied."[43] First and foremost, it must be borne in mind that Peace requested a disbursement of all the plan assets to which he was entitled in 1987 in lieu of awaiting the future receipt of benefits under an employer's plan. Disbursement of the plan assets to Peace meant

---

[42]29 U.S.C. § 1132(a).

[43]637 F.2d 357, 361 (5th Cir. 1981).

there was no longer a plan from which to seek benefits. As will be discussed below, Peace knew or should have known in 1987 that the annuity did not guarantee that he would receive $1,155 a month commencing at age 65 for the rest of his life and, accordingly, that the annuity was inadequate to provide all the benefits he was promised the plan would include. His causes of action under ERISA regarding benefits and all other rights associated with the plan accrued when he accepted ownership of the annuity and knew or should have known that it terms differed from those contemplated. The decision in *Paris* is inapposite.

The court in *Paris* began by noting that "[t]he action the plaintiffs protest, and the one we must review, is the trustee's 1975 interpretation of the Profit Sharing Plan. Only with that decision did it become clear that the plaintiffs would be denied benefits."[44] The issue in *Paris* was whether employees who had worked for an employer on June 1, 1973 but were terminated or resigned before February 21, 1974 were entitled to benefits under a profit sharing plan that was created on February 21, 1974 but had a retroactive effective date of June 1, 1973.[45] The court observed that the adoption of this plan "resulted in substantial confusion" and "the status of the plaintiffs was fraught with uncertainty."[46] The former employees' claims for benefits were denied in 1975, and they argued that was the date their causes of action accrued, while the defendant argued that the accrual date was February 21, 1974, when the plan was adopted and established eligibility or non-eligibility for these employees.[47] The accrual date determined whether the cause

---

[44]*Id*. at 360-61.

[45]*Id*. at 358.

[46]*Id*. at 360.

[47]*Id.* at 360-61.

of action accrued before or after ERISA's effective date, which was January 1, 1975, and therefore whether there was jurisdiction in federal court.[48] This court held that the date the trustees construed the plan and denied benefits controlled, explaining, "To hold otherwise 'would put an almost intolerable burden on employees covered by pension plans. It would require individuals who are unversed in the law to be constantly vigilant. . . . Moreover, claims filed before a pension actually has been denied might be challenged for lack of ripeness.'"[49] This reasoning applies to an ongoing plan, but not a plan that has been terminated and its assets distributed.

*Paris* did not purport to establish an inflexible rule for all ERISA cases. The *Paris* decision pointedly cited the First Circuit's decision in *Cowan v. Keystone Employee Profit Sharing Fund*,[50] the facts of which are similar to the ones presently before us. In *Cowan* there had been a shortfall of contributions by an employer to a pension plan for several years. Thereafter, an employee negotiated a termination provision with his employer and was allegedly told "there was no possibility that the company would make up" the contribution shortfalls.[51] The company allegedly concealed the fact that a catch-up plan had been adopted in an amendment to the pension plan that expressly excluded the employee and others similarly situated just twenty-

---

[48]*Id.* at 360.

[49]*Id.* at 361 (quoting *Morgan v. Laborers Pension Trust Fund for N. Calif.*, 433 F. Supp. 518, 522 n.5 (N.D. Cal. 1977)).

[50]586 F.2d 888 (1st Cir. 1978).

[51]*Id.* at 890.

four days before this employee signed a termination agreement in November 1974.[52] Final

payment of benefits under this termination agreement occurred in 1975.[53] The employee learned

of the amended plan's catch-up provisions in 1977 and was denied additional benefits at that

time.[54] The First Circuit held that the employee's cause of action arose in 1974 when the catch-up

plan was adopted.[55] The First Circuit reasoned,

> [W]e must determine the nature of Cowan's claims and when they arose. We feel
> that his allegations can be reduced to the following: Keystone had some obligation
> to Cowan under the original Profit-Sharing Plan to make up the 1970-72 and 1974
> short-falls in pension contributions; when it excluded him from the Catch-Up Plan,
> it violated this obligation. This is essentially a breach of contract claim for acts
> taken in November 1974, when the Catch-Up Plan, written so as to exclude
> employees such as Cowan from the class of beneficiaries, was formally adopted as
> an amendment to the original Profit-Sharing Plan. Any complaint that Cowan has
> must be predicated on rights conferred by the original Profit-Sharing Plan to which
> the Catch-Up Plan was an amendment, and Cowan's claim must be that the first
> plan was amended in violation of his rights. The fact that payments to beneficiaries
> of the Catch-Up Plan were not made until 1976 does not alter this analysis. Since
> the amendment excluding Cowan occurred in 1974, the breach of contract, if any,
> occurred then too.[56]

The *Cowan* decision found inapposite "cases hold[ing] that a cause of action against a

pension plan arises when one is first entitled to receive benefits from the plan[] or when a request

for benefits is denied,"[57] reasoning that these rules should apply when the terms of a plan are

---

[52]*Id*. at 889-90.

[53]*Id*. at 890.

[54]*Id*.

[55]*Id*. at 895.

[56]*Id*. at 894-95 (internal citation omitted).

[57]*Id*. at 895 (internal citation omitted).

unclear and resolution depends on the interpretation of the plan, but certainly not in all ERISA cases:

> This is not a case in which the application or interpretation of the terms of a pension plan are unclear. In such cases, plaintiff obviously has no cause for complaint until he is refused benefits to which he has some colorable claim, since it cannot be known earlier how the instrument will be interpreted by the trustees.[58]

We quoted the foregoing passage from *Cowan* in *Paris* in conjunction with our determination that it did not become clear that the plaintiffs in *Paris* would be denied benefits until the trustees interpreted the plan.[59] We referred to the foregoing quotation a second time in *Paris* immediately following the statement, "for purposes of ERISA a cause of action does not accrue until an application is denied."[60] Following this second reference to *Cowan*, we cited the District of Columbia Circuit's decision in *Kosty v. Lewis*[61] for the proposition that a "[s]tatute of limitations does not commence to run until there has been 'a clear and continuing repudiation.'"[62]

Other circuits have recognized that "an ERISA beneficiary's cause of action accrues before a formal denial, and even before a claim for benefits is filed, 'when there has been a repudiation by the fiduciary which is *clear* and made known to the beneficiar[y].'"[63] None of this

---

[58]*Id.*

[59]*Paris v. Profit Sharing Plan for Employees of Howard B. Wolf, Inc.*, 637 F.2d 357, 361 n.8 (5th Cir. 1981).

[60]*Id.* at 361.

[61]319 F.2d 744, 750 (D.C. Cir. 1963).

[62]*Paris*, 637 F.2d at 361.

[63]*Union Pac. R.R. Co. v. Beckham*, 138 F.3d 325, 330 (8th Cir. 1998) (quoting *Miles v. N.Y. State Teamsters Conference Pension & Retirement Fund Employee Pension Benefit Plan*, 698 F.2d 593, 598 (2d Cir. 1983)); *see also Carey v. Int'l Brotherhood of Elec. Workers Local*

circuit's decisions have had occasion to address squarely a repudiation of rights under a plan before a request for benefits had been made.[64] The proposition that ERISA claims accrue when benefits are denied cannot be a one-size-fits-all rule, irrespective of the facts.

The facts before us reflect that Peace's ERISA claims accrued no later than 1987. When the annuity was issued in 1985, Peace's "notion of it" was that it was supposed to pay him $1,155 a month when he reached age 65 but he admitted, "I had no idea how much the annuity was at the time. I had no idea." His "assumption was it was enough to cover it, my assumption was."

That assumption may have been well-founded in 1984 and 1985, but it could not reasonably have continued after Peace received information about his annuity in 1987 when the "Contract Information" sheet was sent to him at the time the annuity's ownership was transferred to him. That information clearly stated that the annuity guaranteed monthly income of only $216.43 and even then, only for ten years. At the latest, the 1993 annual statement from American General put him on notice that the annuity did not guarantee that it was adequate to fund payments of $1,155 for any extended length of time. Peace knew or should have known that

---

*363 Pension Plan*, 201 F.3d 44, 48 (2d Cir. 1999) ("We . . . follow the Seventh, Eighth, and Ninth Circuits in holding that an ERISA claim accrues upon a clear repudiation by the plan that is known, or should be known, to the plaintiff–regardless of whether the plaintiff has filed a formal application for benefits."); *Daill v. Sheet Metal Workers' Local 73 Pension Fund*, 100 F.3d 62, 66 (7th Cir. 1996) (holding an employee's "cause of action accrued . . . when the fund denied [his] appeal and unequivocally informed him" that he was not eligible under the plan because of a break in service and not when he later filed a formal application for benefits); *Martin v. Constr. Laborer's Pension Trust for S. Cal.*, 947 F.2d 1381, 1384 (9th Cir. 1991) (rejecting the argument that "until [an employee] actually applies for pension plan benefits, and his application is denied, his cause of action to determine rights under the plan has not accrued and the statute of limitations has not begun to run," holding his claim arose when the administrators of the plan had earlier denied eligibility).

[64]*See generally Hall v. Nat'l Gypsum Co.*, 105 F.3d 225 (5th Cir. 1997); *Hogan v. Kraft Foods*, 969 F.2d 142 (5th Cir. 1992).

the plan or fund provided by Kellogg Rust in the form of an annuity did not comport with what he understood to be Kellogg Rust's promise. Peace acquiesced in, if not demanded, the transfer of ownership of the annuity from Kellogg Rust, causing the termination of the pension plan in 1987. Peace had four years thereafter to press his claim that Kellogg Rust had not delivered what it agreed to deliver. Peace's claims accrued more than four years before he filed suit in 2004 and are barred by limitations.

* * * * *

For the foregoing reasons, I respectfully dissent.